**WO**

NOT FOR PUBLICATION

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Universal Engraving, Inc.,                    )    No. CV-08-1944-PHX-GMS
                                              )
            Plaintiff,                        )    **ORDER**
                                              )
vs.                                           )
                                              )
Metal Magic, Inc.; Charles R. Brown,          )
                                              )
            Defendants.                       )
                                              )
_____         )

        Pending before this Court are the following motions: (1) Motion for Summary

Judgment on all counts filed by Defendants Metal Magic and Charles Brown ("Defendants")

(Doc. 202) and (2) Motion for Partial Summary Judgment filed by Plaintiff Universal

Engraving, Inc. ("UEI" or "Plaintiff"). (Doc. 206). For the reasons set forth below, the Court

grants in part and denies in part Defendants' Motion for Summary Judgment, and denies

Plaintiff's Motion for Partial Summary Judgment.

                                    **BACKGROUND**

        Fred Duarte was employed with UEI for approximately fifteen years before he

resigned on June 1, 2007. (Doc. 207, Ex. 2, 3). He was responsible for UEI's Research and

Development Department until 2005 and continued to work for that department until his

resignation. (*Id.*, Ex. 4). While working for UEI, Duarte had access to confidential

information and alleged UEI trade secrets. (*Id.*, Ex. 8).

        Before starting work with UEI, Duarte signed a Confidentiality and Proprietary Rights

Agreement, and subsequently signed similar agreements during his employment. (*Id.*, Ex. 6). At the beginning of January 2004, Duarte executed an Employment Agreement with UEI, which included a confidentiality provision and a non-competition and non-solicitation provision. (*Id.*, Ex. 7).

In mid-April 2007, during a visit to Kansas City, Ted Geisler, a Metal Magic employee, met briefly with Duarte. Duarte had apparently posted his resume online and had expressed interest in moving back to Arizona. (*Id.*, Ex. 10). A few days later, Duarte emailed Geisler to arrange a visit to the Metal Magic facility in early May. (*Id.*, Ex.13, 14). During that visit, Duarte informed Geisler and Defendant Charles Brown, President of Metal Magic, that there was a non-competition provision in his employment agreement with UEI and gave them a copy of that agreement. (*Id.*, Ex. 9). They met with an attorney the next day, and apparently the attorney told Duarte that the employment agreement was drafted too broadly and was thus unenforceable. (*Id.*, Ex. 17, Doc. 208, Ex. 2, 11).

Brown offered Duarte a position as the company's first Manager of Research and Development shortly after the interview. (Doc. 218). In the email offering Duarte the job, Brown stated the Duarte was "the only candidate [he had] encountered with enough qualities to be successful at assuming" the responsibilities of "developing new methods and technology to benefit [Metal Magic's] customers." (Doc. 207, Ex. 18). Duarte accepted Brown's offer on May 12, 2007, and noted that "[g]iven the potential legalities with UEI, [he thought] it would be best to leave in early June and not risk having UEI suggest that [he] had used 2 months, knowing [he] was leaving, for gathering of any information." (*Id.*, Ex.16). On June 1, 2007, Duarte sent an email to all UEI employees announcing his resignation. (*Id.*, Ex. 3). Duarte began work at Metal Magic on June 13, 2007. (Doc. 219).

On August 9, 2007, UEI's attorney sent Duarte a letter informing him of the company's belief that he was working for Metal Magic in violation of his agreement with UEI and asking him to "cease and desist all violations" of that agreement. (Doc. 207, Ex.

22–Ex. D).[1] UEI sent a similar letter to Charles Brown on the same day. (*Id.*, Ex. 22, Ex. E). On August 20, 2007, an attorney from Zwillinger, Georgelos & Greek provided a joint response on behalf of Duarte and Metal Magic, denying that the agreement was enforceable; the letter stated that the firm was representing Duarte for purposes of that letter. (Doc. 206 at 5; Doc. 208, Ex. 11, Ex. C).

In September 2007, UEI filed a lawsuit against Duarte in the United States District Court for the District of Kansas. *Universal Engraving, Inc. v. Frederick Duarte, PhD*, Case No. 2:07-cv-2427-JAR-DJW. (Doc. 207, Ex. 22). UEI alleged claims of breach of contract, misappropriation of trade secrets, breach of duty of loyalty, and violation of the Computer Fraud and Abuse Act. UEI sought damages and injunctive relief. (*Id.*). After holding evidentiary hearings, the Kansas court granted Plaintiff's motion for preliminary injunction. (*Id.*, Ex. 24).

In April 2008, Duarte filed a Notice of Intent to Default on the ground that he could no longer afford to pay his attorney Walter Brown. (*Id.*, Ex. 28). On that same day, Walter Brown filed a Motion to Withdraw as Duarte's attorney. (Doc. 208, Ex. 30). That motion was granted on May 2, 2008. (Doc. 207, Ex. 31). Walter Brown re-entered his appearance to defend Duarte's deposition on June 2, 2008; he did not file a motion to withdraw as counsel following the deposition. (Doc. 207).

On October 10, 2008, the Kansas court granted UEI's Motion for Summary Judgment on Count I of the Complaint – Breach of Contract. (*Id.*, Ex. 36). In reviewing the breach of contract claim, the court noted that Duarte had conceded that there was a contract; that he received consideration; and that he breached that contract. (Doc. 208, Ex. 27). Because the court found that UEI suffered damages as a result of that breach, it held that summary judgment was warranted. (*Id.*). The court also noted that it had the authority to modify the terms of the contract to ensure that the temporal scope of the agreement was reasonable, and

---

[1]Defendants contend that the letter is inadmissible hearsay. (Doc. 208). The letter has not been offered to prove that Duarte violated his UEI agreement, and therefore is not hearsay under Rule 801 of the Federal Rules of Evidence.

thus amended the employment agreement to restrict Duarte's employment with a competitor world-wide for two years. (Doc. 208, Ex. 27). The Kansas court later awarded damages to UEI for the misappropriation of trade secrets and breach of loyalty and granted UEI injunctive relief for the breach of contract claim. (Doc. 207, Ex. 5). Duarte was not present or represented at that hearing. (Doc. 208).

On October 22, 2008, UEI filed this action against Metal Magic and Charles Brown, alleging misappropriation of trade secrets, tortious interference, tort of another, unfair competition, participation in/aiding and abetting a breach of fiduciary duty, and conspiracy. (Doc. 1).

## DISCUSSION

### I.     Legal Standard

Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c)(2). Substantive law determines which facts are material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). "A fact issue is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (quoting *Anderson,* 477 U.S. at 248). When the nonmoving party "bear[s] the burden of proof at trial as to an element essential to its case, and that party fails to make a showing sufficient to establish a genuine dispute of fact with respect to the existence of that element, then summary judgment is appropriate." *Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

### II.    Motion for Summary Judgment

Defendants seek summary judgment on all counts raised in Plaintiff's complaint.

####    a.     Misappropriation of Trade Secrets under AUTSA

- 4 -

"A plaintiff seeking relief for misappropriation of trade secrets must identify the trade secrets and carry the burden of showing they exist. The plaintiff should describe the subject matter of the trade secret with *sufficient particularity* to separate it from matters of general knowledge in the trade or of special knowledge of those persons . . . skilled in the trade." *IMAX Corp. v. Cinema Tech., Inc.,* 152 F.3d 1161, 1164–65 (9th Cir. 1998) (internal quotations marks and citations omitted).

Arizona has adopted the Uniform Trade Secrets Act, "which codifies the basic principles of common-law trade-secret protection, to govern the resolution of trade-secret issues." *Enter. Leasing Co. of Phoenix v. Ehmke,* 197 Ariz. 144, 148, 3 P.3d 1064, 1068 (Ct. App. 1999). In the absence of controlling authority on an issue related to trade secrets, Arizona relies on the Restatement of Torts. *Id.* Under the Arizona Uniform Trade Secrets Act ("AUTSA"), a "trade secret" is "information, including a formula, pattern, compilation, program, device, method, technique or process" that "[d]erives independent economic value . . . from not being generally known to" or "readily ascertainable", and whose owner has made reasonable efforts to maintain its secrecy. A.R.S. § 44-401(4) (2010). "[A] trade secret is not simply information as to single or ephemeral business events. Rather, a trade secret may consist of a compilation of information that is continuously used or has the potential to be used in one's business and that gives one an opportunity to obtain an advantage over competitors who do not know of or use it." *Ehmke*, 197 Ariz. at 148, 3 P.3d at 1068 (internal citations omitted). Under Arizona law, "matters of general knowledge cannot be appropriated as secret, [however,] a trade secret may consist of a combination of elements even though each individual component may be a matter of common knowledge." *Id.* at 149, 3 P.3d at 1069.

Defendants argue that UEI cannot establish that the identified information and processes qualify as trade secrets because all are generally known or readily ascertainable in the industry. (Doc. 202). Specifically, they argue that all fall within one or more of the following categories: (1) information or processes readily ascertainable in written materials published by vendors and trade associations in the industry; (2) information or processes

already known and utilized by Defendants prior to their association with Duarte; (3) the identity of vendors generally known or readily ascertainable in the industry; and (4) Duarte's general knowledge, formal education, experience and skill. (*Id.*). Moreover, Defendants argue that even if UEI could establish that trade secrets are at issue, it could not establish misappropriation because UEI cannot prove that Defendants acquired any of UEI's information with knowledge that the information was acquired by improper means. (*Id.*).

### i.    Trade Secrets[2]

There is no need to address in great detail each of the alleged trade secrets because the inquiry into whether the information and processes are in fact trade secrets raises too many genuine issues of material fact.[3] For instance, UEI highlights some gaps between the information identified by Defendants as part of the public domain and UEI's copper coating process. (Doc. 209). Whether such information as the tools and machine settings used collectively constitute a trade secret is a material fact to be determined by the fact-finder.

With regard to counter production and counter milling, UEI alleges that Duarte was key in developing an extremely efficient and productive process while employed by UEI. (Doc. 215). When Duarte began working at Metal Magic, he may have improved Metal Magic's process by applying the knowledge he gained from UEI. Thus, the question is whether the improvements were made as a result of Duarte's general knowledge and skill or protected "know how." *See Amex Distrib. Co., Inc. v. Mascari*, 150 Ariz. 510, 516, 724 P.2d 596, 602 (Ct. App. 1986) (discussing the policy considerations involved in balancing a business's right to protect trade secrets of which former employees may be aware and an

---

[2]Names of alleged trade secrets do not constitute information that should be kept under seal.

[3]The Court does not address the Renishaw tool sensors or CNC Machine trade secrets because Defendants have failed to make specific arguments regarding these alleged trade secrets. Defendants include specific arguments in their Reply, however, the Court need not consider arguments or evidence raised for the first time in a reply brief. *See Delgadillo v. Woodford*, 527 F.3d 919, 930 n.4 (9th Cir. 2008) ("Arguments raised for the first time in [the] reply brief are deemed waived.").

employee's right to use his "general skills, knowledge and expertise acquired through his experience" (internal quotation marks and citation omitted)); *see also SI Handling Sys., Inc. v. Heisley*, 753 F.2d 1244, 1262 (3d Cir. 1985) (noting that while an employee's "know-how" with regard to specific methods and techniques may be protected under trade secret law, an employee may still be entitled to use his "'experience, knowledge, memory, and skill, which he gained'" from his previous employment (quoting *Van Prods. Co. v. Gen. Welding & Fabricating Co.*, 213 A.2d 769, 776 (Pa. 1965) (internal quotations omitted))).  Additionally there remains the question of whether, despite the fact that the products and at least some aspects of the process are publicly available and readily ascertainable, the specific combination of products used by UEI and aspects of the process developed by the company constitute a trade secret. Once again, these questions are simply too fact-dependent to be resolved by summary judgment. *See Ehmke*, 197 Ariz. at 149, 3 P.3d at 1069 ("[A] trade secret may include a grouping in which the components are in the public domain but there has been accomplished an effective, successful and valuable integration of those public elements such that the owner derives a competitive advantage from it.").

With regard to MIMS, Plaintiff has produced sufficient evidence to suggest that while Duarte was an employee of UEI, he collaborated with a third-party consultant engaged by UEI to develop the computer program referred to as "MIMS." In his affidavit, the consultant described the program as unique and noted that the MIMS software "eliminates the need for programming at the CNC Mill which can be time consuming" and "the simplified display of images already programmed reduces the potential for operator error and rework." (Doc. 209, Ex. F). Thus, the program could be described as one which "[d]erives independent economic value . . . from not being generally known [or] readily ascertainable." A.R.S. § 44-401(4)(a). The issue of whether the program constitutes a trade secret is a genuine issue of material fact for the fact-finder to resolve.

Plaintiff contends that the identity of its vendors is a trade secret. (Doc. 215). Specifically, Plaintiff seems to be arguing that Defendants would never have purchased products from identified vendors if Duarte had not advised them that those products would

improve Defendants' business. (Doc. 216 (stating that although UEI's agreements with the identified vendors did not contain provisions prohibiting those vendors from selling its products to others, that fact was immaterial "since Duarte provided Defendants with UEI's confidential and trade secret information regarding the products UEI purchases")). Arizona courts have found, under some circumstances, that a customer list qualifies as a trade secret. *See Inter-Tel (Delaware), Inc. v. Fulton Commc'ns Tel. Co., Inc.*, 2007 WL 1725349, at *6 (D. Ariz. June 12, 2007) (stating that under Arizona law, "'[a] list of customers, if their trade and patronage have been secured by years of business effort and advertising and the expenditure of time and money' has been held to 'constitute[] an important part of a business' that merits protection as a trade secret" (quoting *Prudential Ins. Co. v. Pochiro*, 153 Ariz. 368, 371, 736 P.2d 1180, 1183 (Ct. App. 1987))); *Wright v. Palmer*, 11 Ariz.App. 292, 295, 464 P.2d 363, 366 (Ct. App. 1970) (quoting RESTATEMENT OF TORTS § 757 cmt. b (1939), which states that a trade secret may consist of "a list of specialized customers"). However, it appears that Arizona courts have not addressed the issue of vendor lists as trade secrets. Plaintiff cites *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1108 (9th Cir. 2001), in which the Ninth Circuit interpreted Montana's definition of "trade secret," which is identical to Arizona's definition, as including the identity of a supplier. In that case, the Ninth Circuit concluded that Plaintiff's list of suppliers, which included information about specific products she purchased from each, constituted a trade secret. *Id.* Here, Plaintiff is not merely contending that Defendants received information about alternate vendors and their prices, *see SI Handling*, 753 F.2d at 1257, but rather that they received valuable information about specific products made by the identified vendors that would not have been readily ascertainable to Defendants or others in the industry. Contrary to Defendants' argument, such information may be a trade secret under Arizona law, and Defendants have not met their burden of showing that no reasonable juror could conclude that the information constituted a trade secret.

Defendants are entitled to summary judgment with regard to UEI's claim that Defendants' development of Rotary/Steuer dies and relevant software resulted from

disclosure of a trade secret. Plaintiff seems to argue that the use of the Lang Impala 400 CNC machine and relevant software to produce rotary dies in-house constitutes a trade secret. (Doc. 215). One of the primary bases for Plaintiff's argument that Defendants inquired into and purchased the Impala 400 CNC is that "Defendants contacted Duarte in March 2007." (Doc. 209). However, in its "Statement of Undisputed Material Facts," Plaintiff acknowledged that the very first contact between Duarte and a Metal Magic employee did not take place until mid-April. (Doc. 207). Defendants had already discussed the Impala 400 CNC machine, including the price and an installation plan, several weeks before Defendants first spoke with Duarte and several months before he started working at Metal Magic. (Doc. 203, Ex. B(12)). In fact, Charles Brown visited Lang's facilities in Germany in March 2007. (Doc. 203). It is clear that information regarding this machine and the applicable installation plan were readily accessible to Metal Magic and that Metal Magic was seriously considering purchasing an Impala machine long before Duarte was employed by Metal Magic. *See Ehmke*, 197 Ariz. at 149, 3 P.3d at 1069 ("Because the hallmark of a trade secret obviously is its secrecy, not only must the subject-matter of the trade secret be secret, it must be of such a nature that it would not occur to persons in the trade or business." (citing *Wright*, 11 Ariz.App. at 295, 464 P.2d at 366)). There is not sufficient evidence in the record to raise a material fact as to whether Defendants' decision to purchase the Impala 400, rather than the Impala 800 or any other machine, was attributable to Duarte. Thus, Defendants are entitled to summary judgment on this claim.

Thus, Plaintiff has raised issues of fact with respect to the following alleged trade secrets: (1) the copper coating process; (2) counter production; (3) MIMS; and (4) the identity of vendors. Plaintiff has not shown that Metal Magic's development of Rotary/Steuer dies resulted from disclosure of a trade secret, and therefore, summary judgment is proper on that issue.

### ii.    Misappropriation

Even if all the processes and information identified by UEI are trade secrets, UEI must still establish that Defendants misappropriated those trade secrets. *See* A.R.S. § 44-401(2).

Plaintiff argues that Defendants have misappropriated UEI trade secrets by:

> (a) acquiring the trade secrets from Duarte, knowing or having reason to know that the trade secrets were acquired by improper means, *see id.* § 44-401(2)(a);

> (b) disclosing or using UEI trade secrets without express or implied consent after using improper means to acquire knowledge of the trade secret or at the  time of disclosure or use, knowing or having reason to know that the knowledge was derived from Duarte, who had utilized improper means to acquire it, *see id.* § 44-401(2)(b).

"'Improper means' includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy or espionage through electronic or other means." *Id.* § 44-401(1). Defendants contend that Plaintiff cannot prove that Duarte downloaded any of UEI's trade secrets, and even if he did, Plaintiff cannot show that Defendants acquired the information with knowledge that Duarte acquired it by improper means. (Doc. 202).

For purposes of this motion, UEI has presented sufficient evidence to show that it took steps to maintain the secrecy of its alleged trade secrets. The Kansas court held that Duarte's UEI employment agreement, which included a non-competition and confidentiality provision, was valid at least for two years. (Doc. 207, Ex. 36). That agreement may serve as a basis for a "duty to maintain secrecy," at least as to Duarte and information he obtained while in the employ of UEI. *Cf. Miller v. Hehlen*, 209 Ariz. 462, 471, 104 P.3d 193, 202 (Ct. App. 2005) (noting that because the employment agreement cannot be enforced, "that agreement cannot serve as the basis for a 'duty to maintain secrecy'"); *see also CamMate Sys., Inc. v. Telescopic, LLC*, 2008 WL 215830, at *3 (D. Ariz. Jan. 23, 2008) (taking into consideration the fact that Telescopic did not reveal its trade secret to CamMate until after CamMate signed an agreement not to duplicate that trade secret); *USA Power, LLC v. PacifiCorp*, 235 P.3d 749, 762 (Utah 2010) ("A confidentiality agreement . . . may serve as evidence that the parties expected confidentiality and that, therefore, use of the trade secret constitutes misappropriation."). Defendants admit that they were aware of Duarte's UEI employment agreement, having received a copy before they hired Duarte. (Doc. 207, Ex. 9). However, Defendants maintain that they made clear to Duarte that they did not want him to disclose any of UEI's confidential information. (Doc. 202). In any event, Defendants were

1    on notice that Duarte was prohibited from sharing confidential information, whether the

2    information rises to the level of a trade secret or not.

3          Plaintiff's experts could not conclusively determine that Duarte actually downloaded

4    the files that were accessed shortly before Duarte's departure from UEI. (Doc. 203, Ex. LLL;

5    Ex. K ("The computer doesn't track downloading to [USB device.] In situations where we're

6    trying to determine what was copied to a particular device, we can often match the time the

7    device was last connected to the computer to the last access times to a series of files. If those

8    last access times are within seconds or minutes of the time the USB device was connected,

9    one can often make the conclusion that those files were copied to that device."). And Duarte

10   claims that he only downloaded personal documents and music, although he cannot produce

11   the USB device because he apparently lost it. (Doc. 209, Ex. R). However, UEI has presented

12   evidence that in June 2007, Duarte emailed a confidential UEI document to several Metal

13   Magic employees, including Charles Brown. (*Id.*, Ex. V). This evidence raises the issue of

14   whether Metal Magic acquired "a trade secret [from Duarte with the knowledge that] the

15   trade secret was acquired by improper means." This evidence, combined with evidence that

16   Duarte assisted Metal Magic in establishing or improving programs and processes similar to

17   those used by UEI raises a genuine issue of material fact that should be determined by the

18   fact-finder.

19         Finally, under AUTSA, a plaintiff that successfully establishes the misappropriation

20   of trade secrets may seek relief in the form of injunctive relief, monetary damages and

21   attorneys' fees. *See* A.R.S. § 44-402–404. Monetary damages "may include both the actual

22   loss caused by misappropriation and the unjust enrichment caused by misappropriation that

23   is not taken into account in computing actual loss. In lieu of damages measured by any other

24   methods, [damages] may be measured by imposition of liability for a reasonable royalty for

25   a misappropriator's unauthorized disclosure or use of a trade secret." A.R.S. § 44-403(A).

26   Plaintiff seeks damages as a result of unjust enrichment and reasonable royalty damages and

27   provides some documentation that could form the basis of a finding of damages, including

28   an email from a Metal Magic employee discussing the cost savings resulting from a change

1    to one of Metal Magic's processes, which Plaintiff attributes to the misappropriation of its

2    trade secrets. (Doc. 209). Viewing the facts and evidence in the light most favorable to the

3    non-moving party, Plaintiff has presented sufficient evidence to survive summary judgment

4    on the issue of misappropriation of trade secrets.

5              **b.    Tortious Interference with Contract and Business Expectations**

6          To prevail on a claim for tortious interference with Duarte's employment contract,

7    Plaintiff must establish: (1) the existence of a valid contractual relationship or business

8    expectancy; (2) Defendants' knowledge of the relationship or expectancy; (3) Defendants'

9    intentional interference inducing or causing a breach or termination of the relationship or

10   expectancy; (4) resultant damages to UEI; and (5) that Defendants acted improperly. *Wells*

11   *Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Local No. 395 Pension Trust*

12   *Fund*, 201 Ariz. 474, 493, 38 P.3d 12, 31 (2002). "'[A] competitor does not act improperly

13   if his purpose at least in part is to advance his own economic interests.'"*Miller*, 209 Ariz. at

14   471, 104 P.3d at 202 (quoting *Bar J Bar Cattle Co. v. Pace*, 158 Ariz. 481, 485, 763 P.2d

15   545, 549 (Ct. App. 1988) and citing RESTATEMENT (SECOND) OF TORTS § 768 (1979)).

16   Plaintiff contends that Defendants knowingly induced Duarte to violate the terms of his

17   employment agreement by working for Metal Magic, in violation of both the non-

18   competition and confidentiality provisions of Duarte's employment agreement. (Doc. 215).

19         Defendants cannot argue that no reasonable jury could conclude that there was a valid

20   contractual relationship between Duarte and UEI. Although the Kansas court's determination

21   that the contract was valid does not bind Defendants due to the lack of privity, discussed later

22   in this Order, the fact that the Kansas court found the contract valid, raises, at a minimum,

23   a genuine issue of material fact as to whether that contractual relationship is indeed valid.[4]

24   _____

25         [4] Defendants argue that the contract is unenforceable under Arizona law. (Doc. 202).
     Although the Court need not decide which law applies to this issue at this time, the evidence
26   indicates that the relevant agreement between Duarte and UEI, a Kansas corporation, was
     signed in Kansas, and therefore, Kansas law likely determines the validity of the agreement.
27   *See Ross v. Ross*, 96 Ariz. 249, 251, 393 P.2d 933, 934 (1964) ("'Matters bearing upon the
28   execution, the interpretation and the validity of a contract are determined by the law of the

Defendants do not deny that they were aware of Duarte's agreement or the provisions therein. (Doc. 202). Defendants instead contend that they did not intentionally interfere with the confidentiality provision of Duarte's employment agreement. (*Id.*). Specifically, they aver that they told Duarte that they did not want him to disclose any of UEI's information, and to their knowledge, none was provided. (*Id.*). With regard to the non-competition agreement, Defendants raise the defense of reliance on the advice of counsel.

"'There is no technical requirement as to the kind of conduct that may result in interference," although "[i]n most instances the interference is by inducement." *Wells Fargo*, 201 Ariz. at 494, 38 P.3d at 32 (quoting RESTATEMENT (SECOND) OF TORTS § 766 cmt. k). "'The essential thing is the intent to cause the result.'" *Id.* (quoting RESTATEMENT (SECOND) OF TORTS § 766 cmt. h). "[I]ntent is shown by proving that the interferor either intended or knew that '[a particular] result was substantially certain to be produced by its conduct.'" *Id.* (quoting *Snow v. W. Sav. & Loan Ass'n.*, 152 Ariz. 27, 33, 730 P.2d 204, 211 (1986)). Plaintiff claims that Metal Magic hired Duarte because of his UEI experience and access to valuable confidential information, and that throughout his employment at Metal Magic, Duarte made Defendants aware that he was relying on confidential UEI information in his work. (Doc. 215).

On this record, a jury could reasonably find that Defendants knew with substantial certainty that by hiring Duarte, Duarte would likely disclose confidential UEI information, even if Defendants did not specifically intend for this to occur. Duarte testified that during his first visit to Metal Magic before being hired, Charles Brown asked Duarte if he would be able to improve the programming related to CNC machinery, to which Duarte replied that he had knowledge of CNC machinery and could assist Metal Magic after studying the

---

place where the contract is made.'" (quoting *Scudder v. Union Nat'l Bank*, 91 U.S. 406, 412–13 (1875)); *see also Taylor v. Sec. Nat'l Bank*, 20 Ariz.App. 504, 507, 514 P.2d 257, 260 (Ct. App. 1973) (noting that "the local law of the state having the most significant relationship to the transaction and the parties is the law to be applied, in the absence of an effective choice of law by the parties").

1   company's machinery. (Doc. 209, Ex. R). In contrast, Charles Brown testified that before

2   hiring Duarte, he did not ask Duarte about his work or responsibilities at UEI, never called

3   Duarte's references nor did he receive Duarte's resume. (*Id.*, Ex. A). However, in Charles

4   Brown's email offering Duarte the position of Research and Development Manager, he stated

5   that he could "honestly say [that Duarte is] the only candidate [he has] encountered with

6   enough qualities to be successful at assuming these responsibilities", responsibilities that

7   until that time Mr. Brown had always managed himself. (*Id.*, Ex. P). The email combined

8   with Duarte's testimony raises an issue of genuine fact as to whether Defendants hired

9   Duarte for the purpose of having him work on projects similar to those that he was tasked

10  with at UEI. From these facts, a jury may infer that Defendants knew with substantial

11  certainty that by hiring Duarte as Metal Magic's Research and Development Manager,

12  Duarte would disclose confidential UEI information.[5]

13       With regard to Duarte's non-competition provision, Metal Magic employees,

14  including Defendant Charles Brown, were aware of the terms of Duarte's agreement and

15  appear to have acknowledged that hiring Duarte may involve some "legalities." (Doc. 207,

16  Ex. 8). Defendants raise the defense of reliance on advice of counsel that Duarte's non-

17  competition provision was unenforceable. (Doc. 202).[6] Plaintiff challenges Defendants'

18  reliance on this defense, arguing that under Rule 8(c) of the Federal Rules of Civil Procedure,

19  a party "must affirmatively state any avoidance or affirmative defense." More specifically,

20  under the Rule, "a party, with limited exceptions, is required to raise every defense in its first

21  responsive pleading, and defenses not so raised are deemed waived." *Morrison v. Mahoney*,

22  399 F.3d 1042, 1046 (9th Cir. 2005). Defendants do not address in their Reply Plaintiff's

23  assertion that the defense of reliance on the advice of counsel had to be raised in Defendants'

24

25       [5] *Cf. Glen K. Jackson, Inc. v. Roe*, 273 F.3d 1192, 1202 (9th Cir. 2001) ("[A] district

26  court 'may grant summary judgment on any legal ground the record supports.'" (quoting 6 JAMES W. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 56.14[1] (1994))).

27       [6] Defendants also raise this defense with regard to the unfair competition claim. (Doc.

28  202).

1    answer, and therefore concede this point. (Doc. 239). Thus, Defendants may not rely on this

2    defense in arguing their motion.

3           Defendants challenge UEI's claim of damages for Defendants' alleged interference

4    with Duarte's contract. Plaintiff relies on its argument for damages resulting from the alleged

5    misappropriation of trade secrets. (Doc. 215). Those damages relate to the general research

6    and development costs avoided by Metal Magic as a result of the misappropriation and

7    specific cost savings from implementing a process to "coat and surface" metal, which

8    Plaintiff claims is a UEI trade secret. In Plaintiff's Response to Defendants' Separate

9    Statement of Facts, Plaintiff provides some additional information comparing the financial

10   state of UEI with that of Metal Magic since Duarte's departure. (Doc. 209).

11          "The law [] requires 'a reasonable basis in the evidence for the trier of fact to fix

12   compensation when a dollar loss is claimed.'" *Short v. Riley*, 150 Ariz. 583, 586, 724 P.2d

13   1252, 1255 (Ct. App. 1986) (quoting *Nelson v. Cail*, 120 Ariz. 64, 67, 583 P.2d 1384, 1387

14   (Ct. App. 1978)). The damages Plaintiff claims for the research and development costs

15   avoided by Metal Magic do not form a reasonable basis for determining damages resulting

16   from the interference with Duarte's employment contract. However, Plaintiff has made some

17   argument that UEI has experienced financial harm in terms of a decreased annual growth rate

18   as a result of Duarte's departure and specific savings experienced by Metal Magic as a result

19   of the alleged misappropriation, and therefore, the Court will deny Defendants' motion for

20   summary judgment as to this issue. *Cf. Nelson*, 120 Ariz. at 67, 583 P.2d at 1387 (Under

21   Arizona law, "once the right to damages has been established, uncertainty as to the amount

22   of damages will not preclude recovery.").

23          Finally, Defendants' interference must have been "'improper as to motive or means'

24   before liability will attach." *Hill v. Peterson*, 201 Ariz. 363, 366, 35 P.3d 417, 420 (Ct. App.

25   2001) (quoting *Wagenseller v. Scottsdale Mem'l Hosp.*, 147 Ariz. 370, 388, 710 P.2d 1025,

26   1043 (1985)). The "party seeking summary judgment always bears the initial responsibility

27   of informing the district court of the basis for its motion, and identifying those portions of

28   the pleadings, depositions, answers to interrogatories, and admissions on file, together with

1   the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material

2   fact." *Celotex*, 477 U.S. at 323 (internal quotation marks omitted). Defendants appear to

3   challenge the final element by arguing that their conduct could not be improper because

4   Duarte's employment agreement was unenforceable under Arizona law and they relied on

5   the advice of counsel. But as  explained, the validity of the employment agreement is likely

6   to be determined by Kansas law, not Arizona law. Further, as previously noted Defendants

7   have not properly raised the defense of reliance on the advice of counsel. Accordingly,

8   Defendants have not met their initial burden with regard to the improper conduct element,

9   and therefore, summary judgment is not appropriate.

10           **c.       Tort of Another–Third Party Litigation**

11           Under Arizona law, Plaintiff must establish the following five elements to succeed on

12   a claim of tort of another: (1) Plaintiff became involved in a legal dispute because of

13   Defendants' tortious conduct; (2) the dispute was with a third party; (3) Plaintiff incurred

14   attorneys' fees in connection with that suit; (4) the expenditure of attorneys' fees was a

15   foreseeable or necessary result of the tortious conduct; and (5) the claimed fees are

16   reasonable. *Collins v. First Fin. Servs., Inc.*, 168 Ariz. 484, 486–87, 815 P.2d 411, 413–14

17   (Ct. App. 1991). Defendants solely challenge element one. (Doc. 202).[7] Plaintiff already has

18   met its burden at least with respect to its misappropriation of trade secrets claim, which

19   involves a legal dispute based on Defendant's alleged tortious conduct with respect to the

20   employment of Duarte, and therefore, summary judgment is not appropriate with respect to

21   _____

22           [7]Although Defendants mention in passing in their Reply that UEI has failed to
    establish issues of fact for "all of the prima facie elements of each of its claims," the Court

23   need not consider arguments raised for the first time in a reply brief. *See Zamani v. Carnes*,
    491 F.3d 990, 997 (9th Cir. 2007). Additionally, Defendants appear to argue that Plaintiff

24   cannot meet its burden to establish element four, stating that the Kansas lawsuit was not a
    result of Defendants' conduct, but rather "UEI's own decision to incur duplicative and

25   unnecessary legal fees in an effort to get two bites at the apple." (Doc. 207). Defendants do
    not "initially identify" any specific facts that "'demonstrate the absence of a genuine issue

26   of material fact.'" *F.T.C. v. Stefanchik*, 559 F.3d 924, 927 (9th Cir. 2009) (quoting *Celotex*,
    477 U.S. at 323). Accordingly, Defendants have not met their initial burden with respect to

27   this element of the claim.

28

1   this claim.

2       **d.**    **Unfair Competition**

3       As Plaintiff noted, the "general purpose of the doctrine [of unfair competition] is to

4   prevent business conduct that is 'contrary to honest practice in industrial or commercial

5   matters.'" *Fairway Constructors, Inc. v. Ahern*, 193 Ariz. 122, 124, 970 P.2d 954, 956 (Ct.

6   App. 1998) (quoting *Am. Heritage Life Ins. Co. v. Heritage Life Ins. Co.*, 494 F.2d 3, 14 (5th

7   Cir. 1974)). "The doctrine encompasses several tort theories, such as . . . misappropriation."

8   *Id.* Defendants argue that UEI has failed to establish the underlying tort theories of

9   misappropriation of trade secrets or tortious interference, and therefore UEI's claim fails as

10  a matter of law. (Doc. 202). Plaintiff has, in fact, met its burden with regard to the

11  abovementioned tort claims, including misappropriation of trade secrets, and with regard to

12  the resultant damages. Therefore, summary judgment is not appropriate with respect to this

13  claim.

14      **e.**    **Participation in/Aiding and Abetting in Breach of Fiduciary Duty**

15      Under Arizona law, "a person who aids and abets a tortfeasor is himself liable for the

16  resulting harm to a third person." *Wells Fargo*, 201 Ariz. at 485, 38 P.3d at 23. A party must

17  establish the following three elements to succeed on a claim of aiding and abetting tortious

18  conduct: (1) the primary tortfeasor must commit a tort that causes injury to the plaintiff; (2)

19  the defendant must know that the primary tortfeasor's conduct constitutes a breach of duty;

20  and (3) the defendant must substantially assist or encourage the primary tortfeasor in the

21  achievement of the breach." *Id.* (citing *Gomez v. Hensley*, 145 Ariz. 176, 178, 700 P.2d 874,

22  876 (Ct. App. 1984)). Defendants' sole argument is that there is insufficient evidence

23  establishing the third element – that Mr. Brown encouraged or substantially assisted Duarte

24  to breach his duties to UEI. (Doc. 202).

25      In determining whether there is evidence to support the third element, the Court may

26  consider "the nature of the act encouraged, [Defendant's] presence or absence at the time of

27  the tort, his relation to [Duarte] and his state of mind." RESTATEMENT (SECOND) OF TORTS

28  § 876 cmt. d. "'Substantial assistance' means more than 'a little aid,' and 'requires a showing

that the defendant's assistance was a substantial factor in causing the plaintiff's harm.'" *Mann v. GTCR Golder Rauner, L.L.C.*, 351 B.R. 685, 699 (D. Ariz. 2006) (quoting *In re Am. Cont'l Corp./Lincoln Sav. & Loan Sec. Litig.*, 794 F. Supp. 1424, 1434–35 (D. Ariz. 1992)). Arizona courts have explained that the test for substantial assistance "is whether the assistance makes it 'easier' for the violation to occur, not whether the assistance was necessary." *Sec. Title Agency, Inc. v. Pope*, 219 Ariz. 480, 491, 200 P.3d 977, 988 (Ct. App. 2008) (quoting *Wells Fargo*, 201 Ariz. at 489, 38 P.3d at 27). Plaintiff has presented evidence that Mr. Brown knew that Duarte remained employed with UEI at the time that he interviewed Duarte and had received a copy of the employment agreement, which contains confidentiality and non-competition provisions. (Doc. 207, Ex. 9). Nevertheless, Mr. Brown offered Duarte a position at Metal Magic and agreed with Duarte that these actions may result in some "legalities." (*Id.*, Ex. 8, 18). Finally, Plaintiff has presented at least one email that clearly includes confidential UEI information sent by Duarte to Mr. Brown, suggesting that such actions may have been encouraged by Mr. Brown and Metal Magic, in general. Plaintiff has presented sufficient evidence such that a reasonable jury could conclude that Mr. Brown substantially assisted Duarte in breaching his fiduciary duties to UEI.

### f.      Conspiracy to Violate AUTSA

To the extent that Defendants move for summary judgment on the conspiracy claim based on their earlier arguments that Plaintiff is unable to identify specific facts that show that there is a genuine issue for trial with regard to Defendants' alleged violation of AUTSA and resultant damages, their argument fails. With respect to any other aspect of this claim, Defendants once again fail to "initially identify" any specific facts that "'demonstrate the absence of a genuine issue of material fact.'" *F.T.C.*, 559 F.3d at 927 (quoting *Celotex*, 477 U.S. at 323). Accordingly, Defendants have not met their initial burden with respect to this claim.

### g.      Punitive Damages

Defendants argue that Plaintiff has failed to establish that it is entitled to actual damages, and even if it could, it has not presented any evidence that Defendants' conduct

was "undertaken with 'an evil mind.'" (Doc. 202). "This 'evil mind' exists when a defendant intends to injure the plaintiff" or "although not intending to cause injury, the 'defendant consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to others.'" *Mendoza v. McDonald's Corp.*, 222 Ariz. 139, 158, 213 P.3d 288, 307 (Ct. App. 2009) (quoting *Rawlings v. Apodaca*, 151 Ariz. 149, 162, 726 P.2d 565, 578 (Ariz. 1986)). As stated above, Plaintiff has provided sufficient evidence upon which a jury could reasonably conclude that Defendants "consciously pursued a course of conduct knowing that it created a substantial risk to" UEI. The Court, therefore, will leave this issue to the jury. *Id.* (stating that punitive damages is a question that "should be left to the jury if there is any reasonable evidence which will support them" (internal quotation marks and citation omitted)).

### h.   Injunctive Relief

"'[T]he burden of proof . . . in any action for injunction . . . is upon the plaintiff to show a likelihood that the defendant will in the future engage in the conduct sought to be enjoined.'" *Modular Mining Sys., Inc. v. Jigsaw Techs., Inc.*, 221 Ariz. 515, 519, 212 P.3d 853, 857 (Ct. App. 2009) (quoting *State ex rel. Babbitt v. Goodyear Tire & Rubber Co.*, 128 Ariz. 483, 487, 626 P.2d 1115, 1119 (Ct. App. 1981)). Plaintiff has requested a permanent injunction restraining Defendants from directly or indirectly using or disclosing any of Plaintiff's "confidential, proprietary or trade secret information or property," and from "employing or otherwise being affiliated with Dr. Duarte." (Doc. 1). Defendants first contend that the issue of injunctive relief is moot as to the employment of Duarte because the provisions of Duarte's UEI employment agreement were valid, at most, for only two years. Injunctive relief is moot "where events make it absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Babbitt*, 128 Ariz. at 486, 626 P.2d at 1118 (quoting *State v. Ralph Williams' N. W. Chrysler Plymouth, Inc.*, 510 P.2d 233, 238 (Wash. 1973)). Duarte cannot violate an employment agreement that is no longer enforceable. Plaintiff has not provided the Court with any additional facts or argument that persuade the Court that injunctive relief is a proper remedy with regard to Duarte's

employment.

Defendants additionally argue that Plaintiff cannot demonstrate that they will engage in the use or misappropriation of UEI trade secrets in the future, and moreover, cannot establish that Defendants have ever used UEI trade secrets. "'Factors that may point to a danger of future violations include past violations, involuntary cessation of the violations, and their continuance in disregard of the lawsuit.'" *Modular Mining*, 221 Ariz. at 519, 212 P.3d at 857 (quoting *SAL Leasing, Inc. v. State ex rel. Napolitano*, 198 Ariz. 434, 442, 10 P.3d 1221, 1229 (Ct. App. 2000)). Plaintiff has demonstrated, at least with respect to this motion, that Defendants may have misappropriated UEI trade secrets, supporting a finding of past violations. And yet, with the exception of one cite to deposition testimony stating that Defendant no longer applies film laminate to copper plates, Defendants have failed to identify specific facts that "'demonstrate the absence of a genuine issue of material fact'" as it pertains to the current or future use of UEI trade secrets. *F.T.C.*, 559 F.3d at 927. Accordingly, Defendants have not met their initial burden with respect to this claim, and their motion for summary judgment in this respect is denied.

/ / /

## III.    Motion for Partial Summary Judgment: Collateral Estoppel

UEI argues in its motion that Defendants should be precluded from litigating the following issues as they have been previously decided in UEI's lawsuit against Duarte: (1) that UEI and Duarte had a valid contractual relationship; (2) that Duarte misappropriated UEI trade secrets; and (3) that the misappropriation resulted in approximately six million dollars in damages. (Doc. 207). Defendants challenge UEI's issue preclusion argument, stating that Plaintiff has not met its burden in establishing privity. (Doc. 196). Furthermore, Defendants contend that the issues of misappropriation and damages were neither "actually litigated" nor fully and fairly litigated. (*Id.*).

### a.    Choice of Law

"In a diversity case, the district court must apply the choice-of-law rules of the state in which it sits." *Abogados v. AT&T, Inc.*, 223 F.3d 932, 934 (9th Cir. 2000) (citing *Klaxon*

1    *Co. v. Stentor Elec. Mfg. Co., Inc.*, 313 U.S. 487, 496 (1941)); *see Jorgensen v. Cassiday*,

2    320 F.3d 906, 913 (9th Cir. 2003) ("A federal court sitting in diversity must apply the forum

3    state's choice of law rules."). In this case, Arizona's choice-of-law rules determine whose

4    law of collateral estoppel governs. It does not appear that Arizona courts have directly ruled

5    on whether federal or state law governs the issue of collateral estoppel in federal diversity

6    cases.  The Arizona Supreme Court has stated that "[f]ederal law dictates the preclusive

7    effect of a federal judgment." *In re Gen. Adjudication of All Rights to Use Water in the Gila

8    River Sys. & Source*, 212 Ariz. 64, 69, 127 P.3d 882, 887 (2006) (citing *Heck v. Humphrey*,

9    512 U.S. 477, 488 n.9 (1994) ("State courts are bound to apply federal rules in determining

10   the preclusive effect of federal-court decisions on issues of federal law."); *First Pac.

11   Bancorp v. Helfer*, 224 F.3d 1117, 1128 (9th Cir. 2000) ("When considering the preclusive

12   effect of a federal court judgment, we apply the federal law of claim preclusion.")); *see also

13   Maricopa-Stanfield Irrigation & Drainage Dist. v. Robertson*, 211 Ariz. 485, 491, 123 P.3d

14   1122, 1128 (2005) ("Federal law determines the preclusive effect of a federal court judgment

15   in state court."). To be sure, under Arizona law, this rule holds true for federal question

16   cases. However, at issue in this case is a District of Kansas judgment, applying Kansas state

17   law.

18        One Arizona court has concluded that the "law of the forum to first decide" a

19   particular issue "governs the effect to be given" the court's ruling on that issue. *Garcia v.

20   Gen. Motors Corp*., 195 Ariz. 510, 513–514, 990 P.2d 1069, 1072–73 (App. 1999) (citing

21   generally Howard M. Erichson, *Interjurisdictional Preclusion*, 96 MICH.L.REV. 945 (1998)

22   (noting that courts should apply the preclusion doctrine of the court that rendered the

23   judgment at issue regardless of whether the decision was based on federal or state law)). In

24   that case, however, the court appeared to take into consideration the law on which the district

25   court relied. *Id.* at 514, 990 P.2d at 1073 ("In this case, the first court was the federal district

26   court in Idaho. Although it is unclear on which law the trial court relied, the result would be

27   the same under either Arizona or federal law."). Another court concluded that because the

28   "final judgment was issued by a federal court . . . federal law dictate[d] the preclusive effect

of the judgment." *Howell v. Hodap*, 221 Ariz. 543, 546, 212 P.3d 881, 884 (Ct. App. 2009). However, in that case the underlying decision involved an application of federal law, not state law. *Id.* at 545–46, 212 P.3d at 883–84.

The United States Supreme Court has held that, at least as to claim preclusion, "the law that would be applied by state courts in the State in which the federal diversity court sits" governs. *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 508 (2001). The Court reasoned that "[s]ince state, rather than federal, substantive law is at issue there is no need for a uniform federal rule. And indeed, nationwide uniformity in the substance of the matter is better served by having the same claim-preclusive rule (the state rule) apply whether [a case is decided] by a state or a federal court." *Id.* The Restatement (Second) of Judgments § 87 cmt. b takes a slightly different view, stating that the "rules of res judicata are not easily classifiable for purposes of determining whether a federal rule or a state rule should be used to determine a particular effect of a federal judgment." The Restatement provides that procedural aspects of res judicata should be determined by federal law, while more substantive aspects, like privity, should be determined by state law when a federal judgment is governed by state law. Such a rule "correspond[s] to[] the distinction drawn between 'procedure' and 'substance' under the Rules of Decision Act and the doctrine of" *Erie R.R. v. Tompkins*, 304 U.S. 64 (1938). *Id.*

The Court believes that Arizona courts would follow the *Semtek* rule, applying state law to all aspects of collateral estoppel for several reasons. First, the Arizona Supreme Court has cited *Semtek*, a case involving claim preclusion, as the standard for determining which collateral estoppel rules apply in the federal question context, *see Robertson*, 211 Ariz. at 491, 123 P.3d at 1128, and there is no reason to think that Arizona courts would stray from their view that *Semtek*'s rules apply to both claim preclusion and collateral estoppel in the federal diversity context. Indeed, this Court can see no persuasive reason for applying a different set of rules to collateral estoppel. Second, although Arizona courts have long stated that they will "generally follow the Restatement absent [Arizona] statutes or cases to the contrary," they have also noted that they "will not do so blindly." *Barnes v. Outlaw*, 192

Ariz. 283, 285, 964 P.2d 484, 486 (1998). Although the Restatement is consistent with the *Erie* doctrine, the practical effect of a rule that requires application of state law to some aspects of collateral estoppel and federal law to others is to create unnecessary confusion. Finally, at least one Arizona court has implied that courts would look to the law applied by the federal court, whether state or federal, to determine the preclusive effect of an issue decided in that case. *Garcia*, 195 Ariz. at 514, 990 P.2d at 1073 ("In this case, the first court was the federal district court in Idaho. Although it is unclear on which law the trial court relied, the result would be the same under either Arizona or federal law."). Accordingly, Kansas state law on collateral estoppel will be applied in this case.

Under collateral estoppel, "once an issue of ultimate fact has [] been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Phelps v. Hamilton*, 122 F.3d 1309, 1318 (10th Cir. 1997) (applying Kansas law) (internal quotations omitted). "By 'preclud[ing] parties from contesting matters that they have had a full and fair opportunity to litigate,' [collateral estoppel protects] against 'the expense and vexation attending multiple lawsuits, conserv[es] judicial resources, and fost[ers] reliance on judicial action by minimizing the possibility of inconsistent decisions.'" *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) (quoting *Montana v. United States*, 440 U.S. 147, 153–54 (1979)). "'Under Kansas law, collateral estoppel may be invoked where the following is shown: (1) a prior judgment on the merits which determined the rights and liabilities of the parties on the issue based upon ultimate facts as disclosed by the pleadings and judgment, (2) the parties must be the same or in privity, and (3) the issue litigated must have been determined and necessary to support the judgment.'" *Hawkinson v. Bennett*, 962 P.2d 445, 465 (Kan. 1998) (quoting *Jackson Trak Grp., Inc. v. Mid States Port Auth.*, 751 P.2d 122, 128 (1988)). All three elements must be met to invoke the doctrine of collateral estoppel. *Id.*

### b.    Privity

The Court first reviews the issue of whether Defendants were in privity with Duarte so that Defendants are bound by the adverse determinations made by the Kansas court. In the

Kansas case, Duarte was the only named defendant. (Doc. 207, Ex. 24). "A person who was not a party to a suit generally has not had a 'full and fair opportunity to litigate' the claims and issues settled in that suit. The application of [collateral estoppel] to nonparties thus runs up against the 'deep-rooted historic tradition that everyone should have his own day in court.'" *Taylor*, 553 U.S. at 892–93 (quoting *Richards v. Jefferson Cnty.*, 517 U.S. 793, 798 (1996)). Under Kansas law, the general rule is that "a judgment may not be rendered for or against one who is not a party to the action or who did not intervene therein." *Winsor v. Powell*, 497 P.2d 292, 297 (Kan. 1972); *see also Ryder v. Farmland Mut. Ins. Co.*, 807 P.2d 109, 119 (Kan. 1991) (same). Kansas courts nevertheless may apply the collateral estoppel doctrine when privity between a nonparty and a party to a previous case has been established. *See Jackson Trak*, 751 P.2d at 128 (noting that "collateral estoppel may be invoked where . . . the parties [are] the same or in privity"); *see also Phelps*, 122 F.3d at 1319 (same).

"The Kansas Supreme Court defines privity narrowly."*Snyder v. Am. Kennel Club*, 661 F. Supp.2d 1219, 1240 (D.Kan. 2009). "There is no generally prevailing definition of 'privity' which can be automatically applied to all cases. A determination of the question as to who are privies requires careful examination into the circumstances of each case as it arises." *Goetz v. Bd. of Trs.*, 454 P.2d 481, 490 (Kan. 1969); *see also St. Paul Fire & Marine Ins. Co. v. Tyler*, 974 P.2d 611, 618 (Kan. App. 1999) (quoting *Goetz*, 454 P.2d at 490). A common definition of a privy under Kansas law is "'[o]ne who, after rendition of the judgment, has acquired an interest in the subject matter affected by the judgment through or under one of the parties, as by inheritance, succession, or purchase.'" *Wells v. Davis*, 603 P.2d 180, 183 (Kan. 1979) (quoting *Bernhard v. Bank of Am.*, 122 P.2d 892, 894 (Cal. 1942)); *Snyder*, 661 F. Supp.2d at 1240 (same). "'Privity is not established [] from the mere fact that persons happen to be interested in the same question or in proving or disproving the same state of facts, or because the question litigated was one which might affect such other person's liability as a judicial precedent in a subsequent action.'" *St. Paul Fire*, 974 P.2d at 618 (quoting 47 AM. JUR. 2D *Judgments* § 589 (2010)); *see also Snyder*, 661 F. Supp.2d at 1240 (same). Moreover, "there can be no privity between persons unless the result can be

defended on principles of fundamental fairness in a due process sense."*St. Paul Fire*, 974 P.2d at 619.

Plaintiff contends that the employer-employee relationship between Duarte and Defendants establishes the necessary privity as a matter of law because Plaintiff's claims stem from Duarte's employment with Defendants. (Doc. 217). Plaintiff cites several cases in which privity was established when the employer was involved in the first suit and the issue of collateral estoppel was raised in a second suit challenging the actions of the employee with regard to the same transactions or circumstances as those raised in the first case. *See Hamilton's Bogarts, Inc. v. Michigan*, 501 F.3d 644, 651 (6th Cir. 2007); *Corbett v. ManorCare of Am.*, 213 Ariz. 618, 630, 146 P.3d 1027, 1039 (Ct. App. 2006).

Under some circumstances, Kansas law recognizes privity between an employer and employee, specifically when a case addresses actions taken by an employee acting on behalf of the employer. *See Urban By & Through Urban v. King*, 995 F. Supp. 1251, 1256 (D. Kan. 1998) (privity assumed when earlier decision involves a vicarious liability claim predicated on an employee's negligence); *State v. Parson*, 808 P.2d 444, 446–47 (Kan. App. 1991) (finding privity based on employer-employee relationship when employee is charged for operating an unregistered vehicle under a statute that prohibits a person from operating or an owner from knowingly permitting the operation of an unregistered vehicle). However, employees sued individually for their own acts may not be in privity for collateral estoppel purposes. *See Spiess v. Meyers*, 483 F. Supp.2d 1082, 1089 (D. Kan. 2007) (citing *Kentucky v. Graham*, 473 U.S. 159, 167–68 (1985) (victory against defendant in personal capacity is victory against individual, not against entity which employs him)) (reasoning that defendants are not in privity with government employer because they were sued in their individual capacities).

The determinations identified by Plaintiff, however, are best described as pertaining to actions taken by an individual in his own capacity. The breach of contract claim was premised on Duarte's decision to seek employment with a competitor within the time period covered by the non-competition provision. Any claims that Duarte downloaded UEI

1  documents and programs likewise pertain to his own actions while he was a UEI employee.

2  Even if the employer-employee relationship establishes privity, Plaintiff fails to provide

3  sufficient support for the argument that although Metal Magic terminated Duarte's

4  employment, and therefore the employer-employee relationship, long before the Kansas court

5  ruled on the issues raised by UEI in this motion, this Court should nevertheless determine

6  that Defendants remained privies throughout the lawsuit. *Cf. Urban By & Through Urban*,

7  995 F. Supp. at 1256 ("The critical time for assessing privity is when the final judgment was

8  rendered . . . A privy is bound only as to matters properly decided during the period when

9  he is in privity.").[8]

10  To the extent that Plaintiff's argument is really that an employer-employee

11  relationship demonstrates "aligned interests," Plaintiff fails to address how the interests

12  remained aligned after the Kansas court granted the Preliminary Injunction, requiring Metal

13  Magic to terminate Duarte's employment. Defendants have not admitted that their interests

14  and Duarte's were aligned beyond that Metal Magic did not want to fire him. (Doc. 232; Doc.

15  196). Once Duarte was no longer employed by Metal Magic, their interests were not so

16  

17  ────────────

18  [8]Defendants and Duarte maintained an employer-employee relationship until the Kansas court's ruling on the preliminary injunction. However, in the order granting UEI's Motion for Preliminary Injunction, the Kansas court made clear that

19  

20  [i]n cases where the movant has prevailed on the other factors, the Tenth
21  Circuit generally uses a liberal standard for 'probability of success on the
       merits,' so the moving party need only raise 'questions going to the merits so
22  serious, substantial, difficult and doubtful as to make them a fair ground for
       litigation and thus for more deliberate investigation.'

23  

24  (Doc. 207, Ex. 24 (quoting *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*,
    356 F.3d 1256, 1260 (10th Cir. 2004)). The court's review of the misappropriation
25  claim is thus more akin to a "tentative assessment" than a determination that is
    "sufficiently firm to be accorded collateral effect." Because Tenth Circuit case law
26  on preliminary injunctions permitted the Kansas court to apply an even lower standard
    than "substantial likelihood [of success] on the merits," this Court need not treat the
27  Kansas court's findings at that stage as a final adjudication of merits for collateral
    estoppel purposes.
28

1   identically aligned as to establish privity. Accordingly, there is, at a minimum, a question of

2   fact regarding Metal Magic's relationship with Duarte following his termination and whether

3   that relationship is sufficiently similar to an employer-employee relationship as to establish

4   privity.

5       Plaintiff additionally argues that Defendants controlled Duarte's defense in the Kansas

6   case, and as a result, are precluded from challenging the Kansas court's determinations. (Doc.

7   217). Relying on the Restatement of Judgments § 84 (1942), the Kansas Supreme Court has

8   precluded re-litigation of issues previously decided in cases in which a nonparty controlled

9   the earlier action. *Winsor*, 497 P.2d at 298; *see also Taylor*, 553 U.S. at 895 (noting that "a

10  nonparty is bound by a judgment if she 'assume[d] control' over the litigation in which that

11  judgment was rendered" (quoting *Montana*, 440 U.S. at 154)). In *Phelps*, the Tenth Circuit,

12  applying Kansas state law, further explained that "'control,' for purposes of issue preclusion,

13  refers to the ability to exercise 'effective choice as to the legal theories and proofs to be

14  advanced,' as well as 'control over the opportunity to obtain review.'" 122 F.3d at 1319

15  (quoting RESTATEMENT (SECOND) OF JUDGMENTS § 39 cmt. c (1982); *see also In re

16  Thompson*, 240 B.R. 776, 780 (10th Cir. 1999) (same). Because Kansas case law applying

17  the "control" exception is sparse, the Court will look to the relevant Restatement provisions

18  on which the Kansas Supreme Court and Tenth Circuit have relied.

19      "Whether [a nonparty's] involvement in the action is extensive enough to constitute

20  control is a question of fact, to be resolved with reference to the[] criteria [listed in the

21  Restatement]." RESTATEMENT (SECOND) OF JUDGMENTS § 39; *see also* AM. JUR. 2D

22  *Judgments* § 587 ("The question of who is a privy is a factual one requiring a case-by-case

23  examination."); 18A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE &

24  PROCEDURE § 4451 (The question of the measure of control by a nonparty "is essentially a

25  matter of fact . . . Preclusion is fair so long as the relationship between the nonparty and a

26  party was such that the nonparty had the same practical opportunity to control the course of

27  the proceedings that would be available to a party.").

28      Plaintiff argues that control is established by the fact that Defendants hired an attorney

1   to represent Duarte and paid his legal fees. (Doc. 217). UEI contends that such a conclusion

2   is further supported by the existence of a Joint Defense Agreement regarding Duarte's

3   defense, Duarte's perception that Metal Magic was Walter Brown's client, and that

4   Defendants were kept abreast of various aspects of the Kansas case. (*Id.*).

5        Reviewing the facts in the light most favorable to Defendants, the evidence shows that

6   Defendants financed Duarte's defense in the early stages of litigation until the Kansas court's

7   order granting the preliminary injunction in October 2007. (*Id.*, Ex. 8, 29). It is likely that

8   Defendants continued to pay Walter Brown for his legal services, although Defendants do

9   not admit that fact. Plaintiff provides evidence that Duarte never paid any of Walter Brown's

10  fees, (*Id.*, Ex. 9), and the reasonable inference is that Metal Magic in fact paid those fees.

11  Even if that is the case, financing Duarte's defense does not in itself establish privity. *See*

12  *City of Shidler v. H.C. Speer & Sons Co.*, 62 F.2d 544, 548 (10th Cir. 1932) (contributing to

13  the expense of counsel is not sufficient to establish control over the litigation); RESTATEMENT

14  (SECOND) OF JUDGMENTS § 39 ("It is not sufficient, however, that the person merely

15  contributed funds or advice in support of the party [or] supplied counsel to the party.").

16  Moreover, there is some case law to support the conclusion that the fact that Defendants

17  hired an attorney for Duarte rather than having Metal Magic's attorneys represent him in the

18  Kansas case undermines a finding of privity. *See Davin v. Athletic Club of Overland Park*,

19  96 P.3d 687, 691 (Kan. App. 2004) ("While it is not uncommon for an insurance company

20  to be found in privity with its insured, [here the insurance company] hired an attorney to

21  defend [the insured] under a reservation of rights. By doing so, [the insurance company]

22  severed any privity between [the insured] and itself.").

23       Defendants do admit that they entered into a joint defense agreement with Duarte, but

24  the agreement's terms are unclear. To the Court's knowledge, no court has held that the

25  existence of a joint defense agreement, as a matter of law, establishes privity. Rather, such

26  agreements establish shared interests, a factor that may establish privity. *See Asahi Glass Co.,*

27

28

*Ltd. v. Toledo Eng'g Co., Inc.*, 505 F. Supp.2d 423, 434–35 (N.D. Ohio 2007).[9] Again, taking the facts in light most favorable to Defendants, that Defendants paid Duarte's fees only until the Kansas court granted the preliminary injunction and ordered the termination of Duarte's employment, suggests that the joint defense agreement was entered only for purpose of the preliminary injunction hearing or during Duarte's employment. In any event, this remains a genuine issue of fact.

Under Restatement (Second) of Judgments § 39 cmt. c, privity may be established if the choices as to the legal theories and proofs to be advanced and opportunity to obtain review "were in the hands of counsel responsible to the controlling party." It appears that Duarte and Defendants never shared counsel, and moreover, that Duarte's counsel was not controlled by Defendants.[10] According to Walter Brown's deposition testimony, he never represented Defendants in connection with the Kansas lawsuit and never had an attorney-client relationship with them. (Doc. 208, Ex. 12). In addition, he denied that he took direction from them. (*Id.*). The evidence shows that Walter Brown conferred with Metal Magic employees regarding issues such as the market position of Metal Magic and UEI and about the machines used by Metal Magic, and generally about the status of the case. (Doc. 207, Ex. 38, 41). Defendants admit that Walter Brown provided Defendants' attorneys with information concerning some of the proceedings. (*Id.*, Ex. 38). Furthermore, it appears that Duarte, on occasion, sent updates to Metal Magic about the lawsuit. (*Id.*, Ex. 41). The evidence also shows that Charles Brown and other Metal Magic employees were present at a meeting to prepare Duarte for the June deposition, but it does not appear that they participated in the meeting in any way. (Doc. 208, Ex. 9; Doc. 207, Ex. 41).

---

[9]In *Asahi*, the court considered the additional factors that defendant and a third-party were parties to an Indemnification Agreement that gave the third-party "ample incentive to defend their joint interests vigorously", and that they shared counsel. 505 F. Supp.2d at 434.

[10]It appears that at all times Defendants retained their own counsel. *Cf.* 47 AM. JUR. 2D *Judgments* § 589 (explaining that privity may not be established "from the mere fact of employment of the same counsel, although it has also been indicated that the appearance of the same attorney in both actions bolsters a finding of privity").

The evidence establishes that Metal Magic was certainly involved in the Kansas lawsuit, providing information to Duarte's defense attorney and remaining informed about the status of the case; however, the evidence does not sufficiently show that Defendants controlled Duarte's defense by giving instruction to Duarte's attorney, determining which legal theories should be asserted, or deciding whether Duarte should file the Notice of Intent to Default. The facts of this case differ significantly from the facts set forth in *Phelps*, in which a party to that action had been listed as an attorney for the other plaintiffs in a previous case addressing similar issues. 122 F.3d at 1319. In *Phelps*, the court concluded that not only did the party have "input into the legal theories and arguments advanced, but could be said to be directly responsible, along with co-counsel, for 'controlling' the entire course of the state court proceedings." *Id.* "[C]ontrol is not properly inferred from the single circumstance that the allegedly controlling party assisted in development of the case." RESTATEMENT (SECOND) OF JUDGMENTS § 39 cmt. c. In fact, the email exchanges between Defendants, Duarte and Metal Magic's attorneys actually suggest that Metal Magic was attempting to stay informed because of the concern that UEI would join Metal Magic as a defendant in the Kansas case. This fact should not necessarily be equated with control of Duarte's defense.

"The inference of control may be drawn from the concurrence of several" of the abovementioned factors, including payment of counsel fees, assistance in development of the case, and shared interests. *Id.* Nevertheless, given the highly fact-specific nature of this inquiry and Plaintiff's burden, the issue constitutes a genuine issue of material fact.

Although it certainly can be inferred from the facts of this case that Defendants shared many of the same interests with Duarte in that they wanted Duarte to continue working for the company and did not want to be implicated in any misappropriation of trade secrets, establishing the bare minimum for privity – shared interests – does not meet the standard for summary judgment.

Because Plaintiff has not met its burden with regard to the element of privity, the Court need not address the remaining elements of collateral estoppel.

/ / /

1     **c.**  **Defendants' Claim Preclusion Argument**

2     In their Response to Plaintiff's motion, Defendants argue that Plaintiff is precluded

3 from bringing this suit against Defendants because Plaintiff's claims arise out of the same

4 nucleus of facts as those at issue in the Kansas case. Once again, under Rule 8(c) of the

5 Federal Rules of Civil Procedure, "[i]n responding to a pleading, a party must affirmatively

6 state any . . . affirmative defense, including" estoppel. If a party fails to raise an affirmative

7 defense in its first responsive pleading, that defense is deemed waived. *See Morrison v.*

8 *Mahoney*, 399 F.3d 1042, 1046 (9th Cir. 2005); 61A AM. JUR. 2D *Pleadings* § 319 ("Under

9 the Federal Rules of Civil Procedure, a party, with limited exceptions, is required to raise

10 every defense in its first responsive pleading, and defenses not so raised are deemed

11 waived."). Defendants filed an answer to Plaintiff's complaint, in which they listed a number

12 of affirmative defensives. (Doc. 13). Defendants did not list estoppel as a defense, but

13 included a provision "reserv[ing] the right to amend their affirmative defenses as discovery

14 proceeds." (*Id.*). Any amendments to a pleading must comply with Rule 15 of the Federal

15 Rules of Civil Procedure. Defendants have not complied with that rule, and thus, the Court

16 will not consider Defendants' affirmative estoppel defense.

17           **CONCLUSION**

18     In sum, with regard to Defendants' Motion for Summary Judgment (Doc. 202), the

19 Court orders the following:

20     (1) the motion is granted in part and denied in part as to the misappropriation of trade

21 secrets claim;

22     (2) the motion is denied as to the claims of tortious interference, tort of another, unfair

23 competition, aiding and abetting in a breach of fiduciary duty, conspiracy to violate AUTSA,

24 punitive damages and injunctive relief.

25     **IT IS THEREFORE ORDERED** that Defendants' Motion for Summary Judgment

26 (Doc. 202) is **granted in part** and **denied in part**.

27     **IT IS FURTHER ORDERED** that Plaintiff's Motion for Partial Summary Judgment

28 (Doc. 206) is **denied**.

**IT IS FURTHER ORDERED** that in light of the rulings above, the Motions for Summary Judgment (Docs. 217, 219) are moot.

DATED this 29th day of November, 2010.

G. Murray Snow
United States District Judge