Edward F. Novak (#006092)
POLSINELLI SHUGHART PC
One East Washington, Suite 1200
Phoenix, AZ 85004

Anthony J. Romano, *pro hac vice*
Brian J. Zickefoose, *pro hac vice*
POLSINELLI SHUGHART PC
120 W. 12th St., Suite 1600
Kansas City, MO  64105

Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| UNIVERSAL ENGRAVING, INC., a Kansas Corporation,<br><br>                    Plaintiff,<br><br>vs.<br><br>METAL MAGIC, INC., an Arizona Corporation, and CHARLES R. BROWN, an individual,<br><br>                    Defendants. | No. CV-08-1944-PHX- RJB<br><br>**MOTION FOR SANCTIONS FOR SPOLIATION** |

## I.      Factual Background

### A.      Frederick Duarte, PhD.

1.      Frederick Duarte, PhD. ("Duarte") was employed with Plaintiff Universal Engraving, Inc. ("Universal Engraving" or "UEI") for approximately fifteen years before he voluntarily left his employment on June 1, 2007.  November 29, 2010 Order (Doc. 240), p. 1.   Duarte was responsible for UEI's Research and Development Department until 2005 and continued to work for that department until his departure from UEI, maintaining UEI R&D projects on his computer for the duration of his

1

employment.  Duarte executed an employment agreement with UEI on January 5, 2004, which included a confidentiality provision and a non-competition and non-solicitation provision.  *Id.* at pp. 1 – 2.

2.      In April 2007, Duarte interviewed with representatives of Metal Magic, a direct competitor of UEI located in Phoenix, Arizona, regarding possible employment. Deposition of Charles Brown 10/8/09 ("Charles Brown Dep. 10/8/09"), p. 22, ll. 6-25, p. 25, ll. 6-15, attached hereto as Exhibit A; Transcript of Kansas Preliminary Injunction Hearing ("KS P.I. Hrg."), p. 388, ll. 21-22, attached hereto as Exhibit B.

3.      On April 16, 2007, the very same day a Metal Magic representative, Ted Geisler ("Geisler"), met with Duarte in Kansas City, Duarte "accessed" over 69,000 files on his UEI computer.[1]   Andy Antunez Expert Report, p. 5, attached hereto as Exhibit C.

4.      On May 12, 2007, while still employed with UEI, Duarte accepted a position as the Director of Metal Magic's newly-formed Research and Development department.  Deposition of Frederick Duarte 6/2/08 ("Duarte Dep. 6/2/08"), p. 72, l. 22 – p. 73, l. 12, attached hereto as Exhibit D; *see also* e-mail chain, MM/0047 – MM/0048, attached hereto as Exhibit E.

5.      The following Monday, May 14, 2007, Duarte "accessed" another 1,900 UEI files.  Andy Antunez Expert Report, p. 5.  Several days later, on May 18, 19 and 21, 2007, Duarte installed a flash drive on his computer at UEI and again "accessed" information.  KS P.I. Hrg., p. 428, ll. 16-19, p. 475, ll. 16-19; Andy Antunez Expert Report, p. 5.  Duarte claims that he has "misplaced" or "lost" the flash drive.  Duarte's response to UEI's First Requests for Production of Documents, Request 25, attached hereto as Exhibit F; Duarte Dep. 6/2/08, p. 80, l. 8 – p. 81, l. 11.

---

[1]   Judge Robinson, a District Judge in the U.S. District Court for the District of Kansas, found that Duarte accessed ***and downloaded*** UEI's files.  *See* December 18, 2008 Memorandum and Order, p. 8, attached hereto as Exhibit X.

6.     Though he had clearly been "working for" Metal Magic at least a month before, Duarte began working at Metal Magic's facility in Arizona on or about June 12, 2007.  Duarte Dep. 6/2/08, p. 95, ll. 10-17.

**B.     Defendants' Knowledge of Duarte's UEI Employment Agreement**

7.     Metal Magic flew Duarte to Arizona for an interview, where Duarte confirmed with Charles Brown and Geisler that he had an employment agreement with UEI.  Duarte Dep. 6/2/08, p. 35, l. 20 - p. 36, l. 16, p. 47, ll. 17-24; MM/0093, attached hereto as Exhibit G.   Charles Brown already knew that Duarte had an employment agreement with UEI that contained a non-competition provision because Duarte had informed Charles Brown and Geisler of the agreement and provision. Charles Brown Dep. 10/8/09, p. 26, ll. 3-19.  Duarte Dep. 6/2/08, p. 49, ll. 22-24.

8.     Duarte told Geisler and Charles Brown that he was worried about the non-competition provision in his contract with UEI.  Duarte Dep. 6/2/08, p. 49, l. 22 - p. 50, l. 1; *see also* MM/0047.   Charles Brown acknowledged that there may be some "legalities" regarding Duarte's employment agreement with UEI.  KS P.I. Hrg. at p. 424, ll. 7-11.

**C.     The Cease and Desist Letters**

9.     On June 15, 2007, UEI's attorney, Greg Mermis, sent a letter to Duarte advising him that: "UEI will assume that you understand and intend to abide by your on-going duties and obligations to UEI under the terms of the Agreement. Be advised, however, that should you fail to do so, our client UEI will take legal action if necessary to enforce the terms of the Agreement."   June 15, 2007 letter, p. 2, attached hereto as Exhibit H.  When Duarte received the June 15, 2007 letter from Mermis, he asked Metal Magic's attorney to respond on his behalf.  KS P.I. Hrg. at p. 431, ll. 1-6.

10.    On August 9, 2007, Mermis sent a letter to Duarte, which provided that "[w]e now have reason to believe that you are currently working for Metal Magic, a direct    competitor    of    UEI,    in    violation    of    your    Agreement,"    that UEI had retained counsel regarding Duarte's violation and that "UEI intends to

vigorously pursue this matter, including filing a lawsuit seeking monetary damages and an injunction to prevent you from further[] violating the terms of your Agreement." August 9, 2007 letter to Duarte, pp. 1, 2, attached hereto as Exhibit I.

11.    When Duarte received his August 9, 2007 letter from Mermis, he provided it to Charles Brown, who sent it on to Metal Magic's attorney. KS P.I. Hrg. at p. 433, ll. 4-7.  Duarte also gave Cy Brown a copy of his August 9, 2007 letter. Deposition of Cy Brown 11/13/09 ("Cy Brown Dep. 11/13/09"), p. 170, ll. 5-9, attached hereto as Exhibit J.

12.    On August 9, 2007, Mermis, on behalf of UEI, also sent a letter to Charles Brown advising that UEI had reason to believe that Metal Magic knew about Duarte's restrictive covenants with UEI, that UEI had retained counsel regarding the violation of Duarte's agreement with UEI, that "UEI intends to vigorously pursue this matter, including filing a lawsuit seeking monetary damages and injunctive relief."  August 9, 2007 letter to Charles Brown, p. 2, attached hereto as Exhibit K.

13.    On or about August 20, 2007, Duarte, Charles Brown, and Metal Magic, through Metal Magic's counsel, Scott Zwillinger, sent a letter confirming that Duarte was employed by Metal Magic and admitting Metal Magic was a competitor of UEI. August 20, 2007 letter to Mermis, attached hereto as Exhibit L.

### D.    The Kansas Lawsuit

14.    On September 7, 2007, UEI filed a lawsuit against Duarte in the United States District Court for the District of Kansas, in a case styled *Universal Engraving, Inc. v. Frederick Duarte, PhD,* Case No. 2:07-cv-2427-JAR-DJW ("Kansas Case"), alleging breach of contract, misappropriation of trade secrets, breach of the duty of loyalty and violation of the Computer Fraud and Abuse Act and sought injunctive relief and damages.  Complaint, attached hereto as Exhibit M.

15.    When Duarte was served with process in the Kansas lawsuit, he advised Metal Magic.   Deposition of Charles Brown 11/23/09 ("Charles Brown Dep. 11/23/09"), p. 275, ll. 7-10, attached hereto as Exhibit N.

4

16.     Metal Magic engaged counsel for Duarte and paid that counsel in the Kansas Case.  Duarte Dep. 6/2/08, p. 112, ll. 19-21; Charles Brown Dep. 10/8/09, p. 66, ll. 3-5.

17.     On October 16, 2007, UEI was awarded injunctive relief and the Kansas District Court precluded Metal Magic from continuing to employ Duarte.   10/16/07 Memorandum and Order, attached hereto as Exhibit O.

### E.     Metal Magic's Information Technology Systems

18.     Metal Magic does not have a dedicated full-time in-house employee responsible for information technology ("IT").  Deposition of David Sloan 11/20/09 ("Sloan Dep. 11/20/09"), p. 34, ll. 8-12, attached hereto as Exhibit P.

19.     Affinity Technology ("Affinity") is Metal Magic's outsourced IT professional.  Charles Brown Dep. 11/23/09, p. 275, ll. 19-21.

20.     Affinity has been working with Metal Magic for over ten years as Metal Magic's de facto IT department.  Sloan Dep. 11/20/09, p. 30, ll. 17-22, p. 39, ll. 14-16.

21.     From 2007 to present, Metal Magic has had a computer network and/or server, where, for example, if an employee generates a Word document on his or her Metal Magic laptop, he or she has the option of saving it to his or her laptop or to Metal Magic's network.  Sloan Dep. 11/20/09, p. 47, ll. 7-12, 19-25; Deposition of Theodore Geisler 10/7/09 ("Geisler Dep. 10/7/09"), p. 68, ll. 5-9, attached hereto as Exhibit Q.

22.     In 2007, Affinity had Metal Magic on a "backup solution."  Sloan Dep. 11/20/09, p. 48, ll. 13-17.  For example, an employee can save documents to his or her desktop or laptop hard drive and the network if he wants them to be "backed up" or otherwise protected.  Geisler Dep. 10/7/09, p. 68, ll. 8-14.

23.     In 2007, Nobody at Metal Magic was responsible for backing up network files.  Geisler Dep. 10/7/09, p. 104, l. 2 – p. 105, l. 5.  Metal Magic, through Affinity, backed up its e-mail system in 2007 and 2008 to Metal Magic's server.  Charles Brown Dep. 11/23/09, p. 270, l. 25 – p. 271, l. 7.  Metal Magic's network files are, or at the relevant time period were, backed up to an offsite third-party IT storage vendor named

"LiveVault."  Geisler Dep.10/7/09, p. 105, ll. 7-14; Charles Brown Dep. 11/23/09, p. 271, l. 13 – p. 272, l. 12; Sloan Dep. 11/20/09, p. 48, ll. 24-25.

24.    Affinity suggested that Metal Magic backup its computer data by retaining the services of LiveVault.  Sloan Dep. 11/20/09, p. 60, ll. 5-8.  During the relevant time period, Affinity contracted with LiveVault on Metal Magic's behalf to conduct backup services.  *Id.* at p. 49, ll. 8-13.

25.    David Sloan ("Sloan"), the owner of Affinity, who has worked for Metal Magic for 10 years, claims that he does not know what a retention policy is.  *Id.* at p. 64, ll. 17-21.  According to Metal Magic's IT department, the LiveVault "stuff" may have been backed up for a retention period of one year.  *Id.* at p. 59, l. 25 – p. 60, l. 4.

26.    Affinity has never worked with Metal Magic to set up any policies or procedures, regarding securing or safeguarding data, with regard to Metal Magic's information technology systems and computers.  Sloan Dep. 11/20/09, p. 64, ll. 17-19.

**F.    Metal Magic Did Not Timely Institute A Litigation Hold**

27.    According to Defendants, Metal Magic's counsel had not notified them to preserve electronic documents and information as of September 10, 2007.   Charles Brown Dep. 11/23/09, p. 274, ll. 20-25.

28.    Charles Brown initially testified that in "late 2007" he was notified by counsel to preserve all "relevant" e-mails.  *Id.* at p. 24, l. 3 – p. 25, l. 2.  Upon examination by his counsel, however, Charles Brown testified that his counsel likely did not inform him to preserve relevant evidence until 2008.  *Id.* at p. 331 ll. 10-25.

29.    Charles Brown testified that in response to counsel's request to preserve all relevant e-mails, Metal Magic sent out "a company-wide e-mail that went out and asked each person not to delete any e-mail . . . ."   Each employee was left to interpret what "relevant" meant.  Charles Brown Dep. 11/23/09, p. 24, ll. 8-21.

30.    The only "preservation e-mail" in evidence shows that such an e-mail was sent to Metal Magic personnel by Geisler on December 9, 2008.  *See* MET03355, attached, which has been filed under seal, attached hereto as Exhibit R. The e-mail

1   inexplicably instructs the recipients not to "permanently delete any e-mails sent or
2   received from Metal Magic." *Id.*

3        31.    No one at Metal Magic informed Affinity that Affinity needed to take
4   steps to preserve any records with regard to any work that it had done for Metal Magic
5   or to suspend the LiveVault retention plan.  Sloan Dep. 11/20/09, p. 19, ll. 13-17, p.
6   144, ll. 13-17.

7        32.    Metal Magic has never sent any letters to LiveVault instructing them not
8   to destroy, and to in fact keep, information that may have been relevant to this lawsuit.
9   Charles Brown Dep. 11/23/09, p. 272, ll. 12-16.  In fact, Metal Magic did not initially
10  tell their attorneys about LiveVault.  Charles Brown Dep. 11/23/09, p. 272, ll. 6-7.

11       **G.    The "Reinstall" of Duarte's Computer**

12       33.    Metal Magic provided Duarte with a computer upon his employment with
13  Metal Magic.  Charles Brown Dep. 10/8/09, p. 83, ll. 18-20.

14       34.    On September 10, 2007, ***three days*** after UEI filed a lawsuit against
15  Duarte, Affinity, on behalf of Metal Magic, performed a "reinstall" on Duarte's Metal
16  Magic computer.  Sloan Dep. 11/20/09, p. 22, ll. 7-18, p. 139, ll. 3-6; Supplemental
17  Expert Report of Andy Antunez, pp. 2, 12, attached hereto as Exhibit S.

18       35.    Metal Magic did nothing to assure that Affinity's actions on September
19  10, 2007 in performing a "reinstall" on Duarte's computer would not destroy or
20  somehow erase information contained on Duarte's computer prior to that date.  Charles
21  Brown Dep. 11/23/09, p. 274, ll. 15-19.

22       36.    Despite being on notice of potential litigation, Metal Magic did not
23  instruct Affinity to (and Affinity did not) preserve or "back up" the information that was
24  on Duarte's computer when the "reinstall" was conducted on September 10, 2007,
25  pursuant to Metal Magic's request.  Charles Brown Dep. 11/23/09, p. 274, ll. 20-25;
26  Sloan Dep. 11/20/09, p. 104, ll. 4-15.

27

28

37.     Sloan testified that he knows it is possible that data would be lost when there is an upgrade from XP Home to XP Pro, like that performed on Duarte's computer on September 10, 2007.  Sloan Dep. 11/20/09, p. 106, l. 20 to p. 107, l. 7.

38.     Prior to performing a reinstall, Sloan would suggest to his clients that "if this stuff is important to you, you should have it backed up anyway" when a reinstall from XP Home to XP Pro is being done.  *Id.* at p. 108, l. 14 – p. 109, l. 13.

39.     Sloan met with Ogletree attorneys before his deposition and they told him that he would be asked questions by UEI's attorney regarding deposition Exhibit No. 1, which shows that a "reinstall" was performed on Duarte's computer on September 10, 2007.  Sloan Dep. 11/20/09, p. 74, l. 5 – p. 75, l. 15.  Specifically, the Ogletree attorneys told Sloan that UEI's attorneys would want to know "why this upgrade needed to be done on this computer."  *Id.*

**H.     Metal Magic Failed to Secure Duarte's Computer**

40.     After the Temporary Restraining Order in the Kansas case was granted, Charles Brown did nothing to secure Duarte's Metal Magic computer.  Charles Brown Dep. 10/8/09, p. 83, ll. 10-12.

41.     Sometime thereafter, Metal Magic's counsel advised Metal Magic to secure Duarte's Metal Magic computer.  Geisler Dep. 10/7/09, p. 133, ll. 11-20.

42.     Geisler cannot estimate whether it was weeks or months after Duarte allegedly stopped working at Metal Magic that he was instructed to physically move the desktop from Duarte's work station to Charles Brown's office.  *Id* at p. 134, ll. 1-23.

43.     After UEI filed suit against Metal Magic and Charles Brown, neither Charles Brown nor anyone else from Metal Magic took any steps to determine whether Duarte had downloaded or accessed UEI files while he worked for Metal Magic.  Charles Brown Dep. 10/8/09, p. 96, ll. 1-18.

44.     Not only did Metal Magic fail to secure Duarte's computer, Duarte's computer was used by other Metal Magic employees after his departure.  Andy Antunez Expert Report, p. 2.

## I.     Metal Magic's Additional Failures to Preserve Potentially Relevant Electronically-Stored Information

45.     Metal Magic did not contact LiveVault at any time in response to the document requests produced in this case to find out whether there were any backup documents that may have been responsive.  Charles Brown Dep. 11/23/09, p. 271, l. – p. 272, l. 5.

46.     Charles Brown cannot explain why there were responsive e-mails on both his and Geisler's computers that were not produced in this case, but that were located by UEI's computer consultant.  Charles Brown Dep. 11/23/09, p. 14, ll. 6-11.

47.     Metal Magic refused to perform a search of its server or "computer system" to determine whether there were any other documents responsive to UEI's discovery requests.  *Id.* at p. 15, ll. 3-11.  However, Metal Magic has never instructed Affinity or LiveVault to preserve the information on Metal Magic's network.

48.     Geisler, Charles Brown and/or Cy Brown participated in more than a dozen meetings regarding this litigation outside the presence of their counsel. Geisler Dep. 10/7/09, p. 72, l. 11 - p. 73, l. 1.

49.     Geisler does not recall Charles Brown ever asking him to obtain electronic documents for use in the litigation.  Geisler Dep. 10/7/09, p. p. 72, l. 24 – 73, l. 4.

50.     Geisler does not recall Cy Brown ever asking him to take any steps to make copies or secure electronic information for use in this litigation.  *Id.* at p. 73, ll. 5-8.

51.     Charles Brown testified that Geisler was the individual at Metal Magic most knowledgeable about how the Metal Magic network was set up.  Charles Brown Dep. 10/8/09, p. 99, ll. 9-12.

52.     Geisler was the individual at Metal Magic that Affinity had contact with most often.  Sloan Dep. 11/20/09, p. 22, l. 23 – p. 23, l. 6.

53.     Geisler never made a backup of the hard drive on his Metal Magic laptop. Geisler Dep. 10/7/09, p. 125, ll. 19-24.

54.     Geisler did not look at Duarte's network files to see what was on there at any time.  Geisler Dep. 10/7/09, p. 205, ll. 5-7.

55.     Geisler does not recall ever being asked to conduct any type of an investigation of the electronic files at Metal Magic to determine whether, accidentally or otherwise, there were any files or documents that could be identified as belonging to UEI.  Geisler Dep. 10/7/09, p. 205, ll. 8-13.  Geisler does not have any information that anyone else at Metal Magic conducted such an investigation.  *Id.* at p. 205, ll. 14-16.

56.     During Duarte's employment with Metal Magic, he would send e-mails to Geisler regarding work projects, but Geisler stated that he would "just delete them." Geisler Dep. 10/7/09, p. 136, ll. 11-15.  Geisler would delete the e-mails because he did not understand what they were about; he testified that "they were Greek to me."  Geisler Dep. 10/7/09, p. 136, ll. 14-19; p. 102, ll. 3-10.

## J.     Metal Magic's Obstructive Discovery Tactics

57.     Despite being responsive to UEI's outstanding document requests, Defendants repeatedly refused to produce the computer hard drives of Charles Brown or Geisler, which led to UEI seeking Court intervention.  *See* 12/16/09 Motion to Compel, pp. 2-5, describing discovery dispute and Court's Order, attached hereto as Exhibit T Doc. 145, portions of which were filed under seal).

58.     On November 6, 2009, pursuant Court Order, Metal Magic made the hard drives available to UEI.  Lonnie Dworkin, a computer consultant for UEI, retrieved the hard drives from Metal Magic and imaged them.  *See* Nov. Affidavit of Dworkin, attached hereto as Exhibit U.

59.     Dworkin's search located e-mails that were clearly responsive to UEI's document requests but that had never been previously produced.  *Id.*

60.     A majority of the e-mails located in Dworkin's search were sent to or from Duarte's Metal Magic e-mail address and should have been obtained from Duarte's computer.  For example, UEI found an e-mail from Duarte to Charles Brown, Cy Brown and Geisler dated June 20, 2007 (approximately eight days following

10

Duarte's first day of employment with Metal Magic), **in which Duarte provided spreadsheets from UEI's highly confidential and trade secret UniQuote product pricing program to these individuals** with the notation "fyi." *See e.g.* UniQuote Document, attached hereto as Exhibit V. In addition, Duarte forwarded to Charles Brown, Cy Brown and Geisler e-mail messages between Duarte and Raymond Courteau, a third party with whom Duarte had worked at UEI, which specifically referenced M3-I, Defendants' name for the UEI's MIMS program, a trade secret. *See e.g.* Duarte's October 23, 2007 e-mail to Charles Brown, Geisler and Cy Brown, attaching the M3-I program, attached hereto as Exhibit W.

### K.   Andy Antunez's Supplemental Report

61.   UEI's expert reports were due on July 17, 2009.

62.   Andy Antunez ("Antunez"), UEI's retained computer forensic expert, performed an analysis of Duarte's UEI computer and timely submitted an expert report.

63.   Defendants initially agreed to produce Duarte's Metal Magic computer and have it analyzed by a third-party computer forensic expert; however, Defendants reversed themselves immediately prior to the July 17, 2009 deadline for UEI to identify its expert.  Defendants then produced the hard drive several weeks after the deadline. *See* Doc. 52.

64.   UEI then moved to supplement Antunez's expert report, which was limited to analysis of Duarte's UEI computer, with an analysis of Duarte's Metal Magic computer.  *Id.*

65.   At the time UEI filed its Motion to Supplement Expert Report, discovery was scheduled to close approximately three months later.

66.   Judge Snow, however, denied UEI's Motion and UEI was precluded from relying on Antunez's supplemental expert report.  *See* Doc. 77.

67.   According to Antunez's supplemental report, the operating system on Duarte's Metal Magic computer was installed on September 10, 2007, "overwriting any previous operating system, registry information and user activity."  *See* Supplemental

Expert Report of Andy Antunez, pp. 2, 12.  New user profiles were created for Duarte at or about that same time.  *Id.*  at pp. 1 – 2.

68.    According to Antunez's supplemental report, electronic information from Duarte's Metal Magic computer for approximately the first three months of Duarte's employment at Metal Magic were deleted or overwritten.  *Id.* at p. 12.

69.    Moreover, Antunez, through e-mail journaling, was able to see that Duarte had worked on projects and created documents prior to the "reinstall" using the words "UniQuote," "Rotary Emboss," pumiflex," "Uniflex," "coating metal," all of which are technologies at issue in this case.[2]  *Id.* at pp. 9 – 11.

70.    According to Antunez's supplemental report, Metal Magic's network contains a fileserver named "mm2k3."  *Id.* at pp. 3-4.  This fileserver contains a user profile for "Fred."  *Id.*  Duarte had at least several sub-files under his user profile – "Miscell" and "R & D Projects."  Under the "Fred\Miscell" user profile there is a document entitled "UEI Trade names and what they really are."  *Id.*  Under the "Fred\R & D Projects" user profile there is an additional sub-file named "Copper Flow\Metal Laminating."

## II.    Legal Argument and Authorities

### A.    Spoliation Defined

Spoliation is defined as "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation."  *Marceau v. International Broth. of Elec. Workers*, 618 F.Supp.2d 1127, 1174 (D.Ariz. 2009) (citing *West v. Goodyear Tire & Rubber Co.,* 167 F.3d 776, 779 (2nd Cir. 1999)).  Generally, a party seeking sanctions based on the spoliation of evidence must demonstrate the presence of three elements: (1) that the party having control over the evidence had an obligation to preserve it at the time it was altered or destroyed; (2) that the records were altered, destroyed or not preserved with a

---

[2]  Any word with the prefix "Uni" refers to a technology, process or program developed by UEI.

culpable state of mind; and (3) that the altered or destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense. *Ortega Melendres v. Arpaio*, 2010 WL 582189 at *4 (D.Ariz. 2010) (citing *In re Napster, Inc. Copyright Litigation,* 462 F.Supp.2d 1060, 1078 (N.D.Cal. 2006); *Zubulake v. UBS Warburg LLC,* 229 F.R.D. 422, 430 (S.D.N.Y. 2004); *Byrnie v. Town of Cromwell,* 243 F.3d 93, 107-12 (2nd Cir. 2001)).

Nevertheless, "the party seeking to introduce evidence of spoliation need not establish bad faith on the part of the party who destroyed the evidence." *Marceau*, 618 F.Supp.2d at 1174 (citing *Glover v. BIC Corp.,* 6 F.3d 1318, 1329 (9th Cir. 1993) ("[A] finding of 'bad faith' is not a prerequisite to [permit a jury to draw an adverse inference].") ; *Akiona v. United States,* 938 F.2d 158, 161 (9th Cir. 1991)). "A finding of fault or simple negligence is a sufficient basis on which a Court can impose sanctions against a party that has destroyed documents." *Arpaio*, 2010 WL 582189 at *5 (citing *Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfr'g Corp.,* 982 F.2d 363, 369 n. 2 (9th Cir. 1992).

## B.    Duty to Preserve

In order to show that a party has failed to preserve evidence and should be sanctioned, one must first show that that party had a duty to preserve evidence. Here, it is indisputable that Defendants had a legal duty to preserve evidence. The next question is when that duty arose.[3]

"As soon as a potential claim is identified, a litigant is under a duty to preserve evidence which it knows or reasonably should know is relevant to the action." *Arpaio*, 2010 WL 582189 at *4 (citing *Napster,* 462 F.Supp.2d at 1067; *Zubulake v. UBS Warburg LLC,* 220 F.R.D. 212, 218 (S.D.N.Y.2003)). "The duty to preserve material evidence arises not only during litigation but also extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to

---

[3] Nevertheless, Defendants failed to preserve data and/or electronic documents no matter when the duty arose.

anticipated litigation." *Marceau*, 618 F.Supp.2d at 1174 (citing *World Courier v. Barone,* 2007 WL 1119196, at *1 (N.D.Cal. 2007); *Kronisch v. United States,* 150 F.3d 112, 126 (2nd Cir. 1998); *Fujitsu Ltd. v. Federal Express Corp.,* 247 F.3d 423, 436 (2nd Cir. 2001)) ("The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation.").[4]

Here, Defendants had a duty to preserve evidence well before this lawsuit was filed. In April 2007 (at the latest), Metal Magic actively recruited Duarte to leave UEI, a direct competitor, and work for Metal Magic. On the first day of Duarte's interview with Metal Magic, on or about May 8, 2007, Duarte confirmed with Charles Brown and Geisler that he had an employment agreement with UEI and that he was worried about his non-competition agreement. Charles Brown already knew, however, that Duarte entered into a non-competition agreement with UEI because Duarte had previously told Charles Brown and Geisler. Expressing the same concern, Charles Brown told Duarte that there may be some "legalities" regarding his non-competition agreement with UEI. KS P.I. Hrg. at p. 424, ll. 7-11. Accordingly, it is clear that Defendants knew in early May 2007 that they intended to hire an employee who had signed a non-competition agreement with a direct competitor and both Duarte and Defendants were worried about the agreement.

On June 15, 2007, UEI's attorney, Greg Mermis, sent a letter to Duarte reminding him of his duties and responsibilities under his Employment Agreement with UEI, including the confidentiality, non-compete and other contractual obligations. The June 15, 2007 letter also provided that: "UEI will assume that you understand and

---

[4] It is therefore clear that the filing of a lawsuit is not necessary to start the clock; the duty generally begins much earlier. For example, many courts have found that "where a cease and desist letter issues, such a letter triggers the duty to preserve evidence, even prior to the filing of litigation." *Arista Records LLC v. Usenet.com, Inc.*, 608 F.Supp.2d 409, 430 (S.D.N.Y. 2009) (citing *Fox v. Riverdeep, Inc.*, 2008 WL 5244297, *7 (E.D.Mich. 2008) (awarding sanctions where defendant in copyright infringement case failed to preserve evidence, including e-mails, once it received cease and desist letter); *Google Inc. v. American Blind & Wallpaper Factory,* 2007 WL 1848665, at *1 (N.D.Cal. 2007).

14

intend to abide by your on-going duties and obligations to UEI under the terms of the Agreement. Be advised, however, that should you fail to do so, our client UEI will take legal action if necessary to enforce the terms of the Agreement." *See* June 15, 2007 letter at p. 2. When Duarte received the June 15, 2007 letter from attorney Mermis, he asked Metal Magic's attorney to respond on his behalf.

Thus, as of June 15, 2007, Duarte and Defendants had expressed concern regarding Duarte's non-competition agreement, had sought legal counsel and were in receipt of a letter threatening to file a lawsuit if Duarte was breaching the agreement – including working for Metal Magic. Defendants were undeniably on notice that litigation would likely ensue once UEI found out that Duarte was working for Metal Magic. Such notice, or threat of potential litigation, clearly triggered Defendants' duty to preserve documents.

Moreover, on August 9, 2007, shortly after learning that Duarte had gone to work for Metal Magic, attorney Mermis sent a second letter to Duarte, which provided that "[w]e now have reason to believe that you are currently working for Metal Magic, a direct competitor of UEI, in violation of your Agreement," that UEI has retained counsel regarding Duarte's violation and that "UEI intends to vigorously pursue this matter, including filing a lawsuit seeking monetary damages and an injunction to prevent you from further[] violating the terms of your Agreement." *See* August 9, 2007 letter to Duarte at pp. 1, 2. When Duarte received the August 9, 2007 letter, he provided it to Charles Brown, who sent it on to Metal Magic's attorney and Cy Brown.

On August 9, 2007, attorney Mermis, on behalf of UEI, also sent a letter to Charles Brown putting Metal Magic on "formal notice" that its employment of Duarte was a violation of the terms of Duarte's Employment Agreement with UEI. *See* August 9, 2007 letter to Charles Brown at p. 2. The letter also provided that UEI had reason to believe that Metal Magic knew about Duarte's restrictive covenants with UEI, that UEI had retained counsel regarding the violation of Duarte's agreement with UEI, and that "UEI intends to vigorously pursue this matter, including filing a lawsuit seeking

2633549.8

1   monetary damages and injunctive relief." *Id.*, pp. 1, 2.  It could not have been clearer

2   that Metal Magic faced the threat of impending litigation.

3        On or about August 20, 2007, Duarte, Charles Brown, and Metal Magic, through

4   Metal Magic's counsel, Scott Zwillinger, sent a letter confirming that Duarte was

5   employed by Metal Magic and that Metal Magic was a competitor of UEI.  *See* August

6   20, 2007 letter to Mermis.  While Defendants' duty to preserve had been in effect for at

7   least three weeks, at a minimum, the August 9, 2007 letters provide conclusive proof

8   that Defendants should have been preserving relevant documents.  *See Arista*, 608

9   F.Supp.2d at 430; *Fox*, 2008 WL 5244297 at *7; *Google,* 2007 WL 1848665 at *1.

10       Following through on its stated intention, on September 7, 2007, UEI filed a

11  lawsuit against Duarte in the United States District Court for the District of Kansas, in a

12  case styled *Universal Engraving, Inc. v. Frederick Duarte, PhD,* Case No. 2:07-cv-

13  2427-JAR-DJW ("Kansas Case").  The Kansas Case alleged breach of contract,

14  misappropriation of trade secrets, breach of the duty of loyalty and violation of the

15  Computer Fraud and Abuse Act and sought injunctive relief and damages.  UEI's claims

16  against Duarte stemmed from him going to work for Metal Magic, in violation of an

17  employment agreement between Duarte and UEI.

18       When Duarte was served with process in the Kansas Case, he advised Metal

19  Magic.  Metal Magic's attorneys recommended that Kansas City attorney Walter Brown

20  represent Duarte.  Thus, Metal Magic was well aware of the lawsuit and was involved in

21  Duarte's defense.  Under this set of circumstances, any argument that Metal Magic and

22  Charles Brown did not have a duty to preserve relevant evidence is simply not credible.

23       **C.    Defendants Did Not Attempt to Preserve Evidence**

24       Given that the duty to preserve evidence was triggered in June 2007, or at the

25  very latest, August 2007, there is no question that Defendants have failed to meet their

26  duty as a matter of law.  According to Defendants, Metal Magic's counsel had not

27  notified them to preserve electronic documents and information as of September 10,

28  2007.  Interestingly, Charles Brown testified that in "late 2007" he was notified by

16

counsel to preserve all "relevant" e-mails; however, upon examination by his counsel, to which counsel for Plaintiff objected as leading, Charles Brown stated that it is possible his counsel did not inform him to preserve relevant evidence until 2008.  Charles Brown also testified that in response to counsel's request to preserve all relevant e-mails, Metal Magic sent out "a company-wide e-mail that went out and asked each person not to delete any e-mail . . . ."  *See* Charles Brown Dep. 11/23/09, p. 24, ll. 8-21.  Each person was left to interpret what "relevant" meant.

The only "preservation e-mail" in evidence shows that an e-mail was sent to Metal Magic personnel by Geisler on December 9, 2008.  This is almost a year and a half after the duty to preserve evidence was triggered.  Moreover, the content of the e-mail is grossly inadequate for a preservation letter/e-mail.  The generic and ambiguous e-mail instructs certain employees not to "permanently delete any e-mails sent or received from Metal Magic."  Nothing is said about electronic documents other than e-mails or physical documents.

Moreover, no one at Metal Magic *ever* – to this day – informed Affinity, the IT services provider that acted as an IT department for Metal Magic, that it needed to preserve any electronic information, documents and records with regard to any work that it had performed for Metal Magic.  The same goes for LiveVault, the entity that backs up Metal Magic's server.  No one at Metal Magic or Affinity has *ever* – to this day – sent any correspondence to LiveVault instructing them not to destroy and to in fact keep information that may have been relevant to this lawsuit.

### D.    Defendants Did Not Preserve the Contents of Duarte's Computer

A party engages in spoliation of documents as a matter of law if it had "some notice that the documents were potentially relevant" to the litigation before they were destroyed or not preserved.  *U.S. v. Kitsap Physicians Service,* 314 F.3d 995, 1001 (9th Cir. 2002) (quoting *Akiona,* 938 F.2d at 161).  Only a "'minimum link of relevance' is required to permit a jury to draw an adverse inference."  *Marceau*, 618 F.Supp.2d at 1174 (citing *Akiona,* 938 F.2d at 161).  Here, the entire lawsuit surrounds Metal Magic's

2633549.8

employment of Duarte and UEI's confidential and proprietary information that Duarte misappropriated and shared with Defendants. There is no legitimate dispute that the contents of Duarte's computer were and are highly relevant. Yet Defendants completely failed to preserve the contents of Duarte's computer. Such a failure is presumptive evidence that Metal Magic had UEI's information residing on its computers and/or its IT systems.

Moreover, on September 10, 2007, Affinity, on behalf of Metal Magic, performed a "reinstall" on Duarte's Metal Magic computer. According to Andy Antunez, UEI's computer forensic expert, a new operating system on Duarte's Metal Magic computer was installed on September 10, 2007, "overwriting any previous operating system, registry information and user activity." Supplemental Expert Report of Andy Antunez, pp. 12. The data and electronic information from Duarte's Metal Magic computer for approximately the first three months of Duarte's employment at Metal Magic were deleted or overwritten. *Id.* at p. 12. .

Incredibly, this "reinstall" occurred after Defendants learned about the non-competition agreement, after UEI sent multiple cease and desist letters to both Duarte and Metal Magic, and ***three days*** after Universal Engraving filed a lawsuit against Duarte. While bad faith is not required to show spoliation, the timing of the "reinstall" more than exposes Defendants' misconduct and ill motives.

Any argument that the deletion or overwriting of the entire hard drive was not purposeful does not save Defendants. Their actions, giving them the benefit of the doubt, were at the very least negligent. Metal Magic did not instruct Affinity to preserve information that was on Duarte's computer when the "reinstall" was conducted on September 10, 2007. Metal Magic did nothing to assure that Affinity's actions on September 10, 2007 in doing a "reinstall" on Duarte's computer would not destroy or somehow erase information on Duarte's computer prior to that date. Accordingly, Affinity did not back up the data that was on Duarte's computer before the "reinstall." The failure to image Duarte's hard drive or otherwise secure the data contained therein

is especially problematic because Affinity knew that data could be lost during a "reinstall."

Despite the fact that Defendants failed to preserve the data on Duarte's computer and actually destroyed electronic information from the first three months of Duarte's employment, Andy Antunez was still able to find evidence of misappropriation of UEI's trade secrets. Antunez, through e-mail journaling, was able to see that Duarte had worked on projects and created documents prior to the "reinstall" using the words "UniQuote," "Rotary Emboss," pumiflex," "Uniflex," "coating metal," all of which are technologies at issue in this case. Antunez was also able to identify a number of Metal Magic network resources containing UEI trade secret information.

**E.** **Defendants Did Not Preserve the Contents of Metal Magic's Other Computers or Systems**

Affinity is Metal Magic's outsourced IT professional and acts as Metal Magic's IT department. Affinity has been working with Metal Magic for over ten years. From 2007 to present, Metal Magic has had a computer network and/or server and Affinity maintains that network and/or server. If there is a problem with Metal Magic's computer network, Affinity performs the service or repair. In 2007, Affinity had Metal Magic on a "backup solution." For example, Geisler saved documents to the network if he wanted them to be "backed up" or otherwise protected. In addition, Metal Magic backed up its e-mail system in 2007 and 2008 to Metal Magic's server. Metal Magic's network files are, or at the relevant time period were, backed up to an offsite third-party IT storage vendor named "LiveVault." During the relevant time period, Affinity contracted with LiveVault on Metal Magic's behalf to conduct backup services.

As with Affinity, no one at Metal Magic ever informed LiveVault that it needed to preserve any records with regard to any work that it had done for Metal Magic. No one at Metal Magic or Affinity has ever sent any letters to LiveVault instructing them not to destroy and to in fact keep information that may have been relevant to this lawsuit.

1         UEI sought relevant information and documents from Metal Magic's network but

2  Metal Magic refused to provide such information.   Metal Magic's refusal, while

3  patently unreasonable, is to some degree immaterial because Defendants failed to

4  preserve their data.   Neither Affinity nor LiveVault were told by Metal Magic to

5  preserve data – at any time.   While there was a severely belated and insufficient

6  preservation e-mail sent to Metal Magic employees, Metal Magic never even attempted

7  to preserve the data contained on its network.

8         Defendants' failure to preserve its network data is important because Metal

9  Magic's network had space reserved specifically for Duarte.   Metal Magic's network

10  contains a fileserver named "mm2k3."   This fileserver contains a user profile for

11  "Fred."    Thus, Duarte had access to storage space on the network that existed

12  independent from his hard drive.   Duarte had at least several sub-files under his user

13  profile – "Miscell" and "R & D Projects."   Under the "Fred\Miscell" user profile there

14  is a document entitled "UEI Trade names and what they really are."   Under the "Fred\R

15  & D Projects" user profile there is an additional sub-file named "Copper Flow\Metal

16  Laminating."   Despite such relevant data, Metal Magic never attempted to preserve this

17  data.   Consequently, UEI was denied the opportunity to view data under the control of

18  Metal Magic and clearly responsive to UEI's requests for production.

19  **III.   Sanctions**

20         Appropriate sanctions for spoliation include, among other things, "drawing

21  adverse inferences about the contents of the documents destroyed," altered or not

22  preserved and excluding testimony and evidence.   *Arpaio*, 2010 WL 582189 at *3

23  (citing *Leon v. IDX Systems Corp.,* 464 F.3d 951, 958 (9th Cir. 2006); *Glover,* 6 F.3d at

24  1329; *Napster,* 462 F.Supp.2d at 1070-1078).   "A district court 'has the broad

25  discretionary power to permit a jury to draw an adverse inference from the destruction

26

27

28

2633549.8

1   or spoliation against the party or witness responsible for that behavior.'" *Marceau*, 618

2   F.Supp.2d at 1174 (citing *Glover,* 6 F.3d at 1329).[5]

3          Because of Defendants' failure to preserve electronic evidence and obstructive

4   behavior, UEI is entitled to an adverse inference that additional relevant evidence

5   existed on Duarte's Metal Magic computer and that that evidence would have been

6   unfavorable to Defendants.

7          Because of Defendants' failure to preserve electronic evidence and obstructive

8   behavior, UEI is entitled to an adverse inference that relevant evidence existed on Metal

9   Magic's computer network and that that evidence would have been unfavorable to

10  Defendants.

11         Because of Defendants' failure to preserve electronic evidence and obstructive

12  behavior, UEI should be permitted to rely on Andy Antunez's supplemental expert

13  report at trial, which shows conclusively that Defendants destroyed relevant evidence

14  and that Duarte's computer and Metal Magic's network contained UEI trade secret

15  information.  In particular, conclusive evidence that data on Duarte's computer was

16  "wiped," erased or deleted is important because Defendants have refused to

17  unequivocally acknowledge that such data has been "wiped," erased or deleted.  The

18  jury should be permitted to hear such testimony and evidence.

19         Because of Defendants' failure to preserve electronic evidence and obstructive

20  behavior, Defendants should not be permitted to argue that only a small number of UEI

21  documents were found on Metal Magic's computers and computer systems.  Defendants

22  should not be permitted to fail to preserve and destroy relevant evidence and then argue

23  before the jury that no such evidence ever existed.

24         Dated this 7th day of June, 2011.

25

26

27  ───────────────
    [5]   *See also Akiona* at 161; *Zubulake,* 220 F.R.D. at 216 ("The spoliation of
28  evidence germane 'to proof of an issue at trial can support an inference that the
    evidence would have been unfavorable to the party responsible for its destruction.'");
    *Kronisch,* 150 F.3d at 126).

2633549.8

POLSINELLI SHUGHART PC

By: _/s/ Anthony J. Romano_____
     Anthony J. Romano (*pro hac vice*)
     Brian J. Zickefoose (*pro hac vice*)
     120 West 12th Street, Suite 1600
     Kansas City, MO 64105

     Edward F. Novak (#006092)
     Marty Harper (#003416)
     3636 N. Central Ave., Suite 1200
     Phoenix, AZ 85012

     Attorneys for Plaintiff
     Universal Engraving, Inc.

**<u>Certificate of Service</u>**

I hereby certify that on June 7, 2011, I electronically transmitted the foregoing document to the U.S. District Court Clerk's Office by using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing.

L. Eric Dowell, Esq. (Eric.dowell@odnss.com)
Leah S. Freed, Esq. (Leah.freed@odnss.com)
Christopher Meister, Esq. (Christpher.meister@odnss.com)
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
2415 East Camelback Road, Suite 800
Phoenix, Arizona 85016

*Attorneys for Defendants*

     By: _/s/ Anthony J. Romano_
       Attorney for Plaintiffs

2633549.8